### Billy F. JOHNSON and Ellen C. Johnson, Plaintiffs-Appellants,

v.

### J.W. LAWRENCE, D.C., Defendant-Appellee.

Court of Appeals of Tennessee, Middle Section, at Nashville.

March 5, 1986.

Application for Permission to Appeal Denied by Supreme Court Oct. 27, 1986.

**52**

Scott Daniel, D. Russell Thomas, Murfreesboro, for plaintiffs-appellants.

W.E. Herod, Roger T. May, Michael E. Evans, Manier, White, Herod, Hollabaugh & Smith, P.C., Nashville, for defendant-appellee.

## OPINION

LEWIS, Judge.

Plaintiffs Billy F. Johnson and his wife, Ellen C. Johnson,[1] filed their complaint against defendant J.W. Lawrence, a doctor of chiropractic, in which they alleged that Dr. Lawrence negligently treated plaintiff Billy F. Johnson, causing Mr. Johnson to have a stroke.

The case came on for trial and, at the close of all the proof, the trial court directed a verdict as to a portion of plaintiffs' claim and the jury returned a verdict for Dr. Lawrence as to the remainder.

Plaintiffs have appealed and assigned fifteen issues.

The pertinent facts out of which this claim arose are: Plaintiff Billy F. Johnson consulted Dr. Lawrence on January 10,

1979. Mr. Johnson gave Dr. Lawrence a history of having had the flu, sore throat, and sinusitis for which he had been treated by Dr. James C. Bradshaw, a medical doctor. He came to Dr. Lawrence seeking treatment for pain in his neck which radiated to his head. Mr. Johnson attributed the soreness in his neck to watching television in bed.

Dr. Lawrence examined Mr. Johnson on January 10th and detected tense, tight muscles in his neck. Dr. Lawrence also took x-rays which he stated disclosed a narrowing of the disc space between the cervical vertebrae with some arthritic changes and a slight loss of the AP curve. He specifically diagnosed Mr. Johnson as having "nervous tension and strain of the cervical spine." Dr. Lawrence treated Mr. Johnson by cervical traction and manipulation. The cervical traction was designed to pull his head and neck at intervals. Dr. Lawrence manipulated Mr. Johnson's neck with his hands by moving the neck through its "normal range of motion." In order to receive the manipulation treatment, Mr. Johnson lay on his back with his head supported by one of Dr. Lawrence's hands. The fingers of Dr. Lawrence's other hand were used to turn the head. Dr. Lawrence testified that the amount of pressure applied in this procedure is "just barely enough to move the joint."

The treatment on January 10th was uneventful. On January 12th, Mr. Johnson returned and told Dr. Lawrence: "I believe we have done the right thing."

Dr. Lawrence testified that precisely the same treatment was rendered on January 12th as had been rendered on January 10th.

On January 12th, after the treatment was completed, Mr. Johnson and Dr. Lawrence carried on a conversation for approximately five minutes. Dr. Lawrence then told Mr. Johnson he could dress, and Dr. Lawrence left the treatment room. Dr. Lawrence testified that Mr. Johnson did not appear to be having any difficulty in

1. Hereafter plaintiffs will be referred to individ- ually by name or jointly as plaintiffs.

sitting on the table at the time he left the treatment room.

Mr. Johnson dressed and stated that when he attempted to leave the treatment room, he found that he was unable to do so. He laid back down on the table and, shortly thereafter, Dr. Lawrence's assistant came in and discovered that Mr. Johnson was having problems. Dr. Lawrence returned to the treatment room and was told by Mr. Johnson that he could not walk. Mr. Johnson also complained that he was unable to see. Dr. Lawrence checked Mr. Johnson's heart rate, breathing rate, blood pressure, patellar reflexes, and eye reflexes. He also instructed his nurse to call Mr. Johnson's wife, Ellen Johnson, tell her that Mr. Johnson was sick, and ask where he should be sent. Mrs. Johnson requested that Mr. Johnson be sent to McFarland Hospital. A call was placed to Dr. Bradshaw so that he could meet Mr. Johnson at the hospital. An ambulance was called, but, prior to the ambulance arriving at Dr. Lawrence's office, Dr. Lawrence went back into the treatment room with Mr. Johnson. Mr. Johnson continued to complain that the back of his head hurt and asked Dr. Lawrence to do something for him. Dr. Lawrence testified that he told Mr. Johnson that nothing would do any good as the problem was "up in his head." Mr. Johnson continued to ask Dr. Lawrence to do something. Mr. Johnson was upset and anxious and stated that he recalled asking for help.

Dr. Lawrence, for the second time on January 12th, manipulated Mr. Johnson's neck, going through the same motions he had used on the first manipulation. Dr. Lawrence testified that he knew this would not cure or help what appeared to be a stroke but was of the opinion that movement of the head would not be harmful, and he went through these motions solely for the purpose of pacifying Mr. Johnson.

The ambulance arrived and Mr. Johnson was taken to McFarland Hospital in Lebanon, where he was treated by Dr. Bradshaw. He was later transferred to Baptist Hospital in Nashville where he was under the care of Dr. Warren McPherson. Mr. Johnson remained at Baptist Hospital for nine days. Three of those days were spent in the intensive care unit.

Mr. Johnson alleged that the manipulation of his neck by Dr. Lawrence caused an injury which resulted in him having lack of coordination, and derivative problems in walking, dressing himself, or performing any kind of physical activity requiring coordination. Mr. Johnson, after the January 12th incident, began slurring his words and having speech difficulties, including aphasia (the inability to recall the definition of words).

Plaintiffs' first issue is "[d]id the court commit prejudicial error in making inconsistent rulings throughout the case concerning whether the case was a case of professional malpractice or negligence."

■ Plaintiffs argue that Dr. Lawrence, over their objections, "was permitted to make the findings in defendant's favor from the Medical Malpractice Review Board known to the jury in defense counsel's opening statement," and that later the court determined that the Medical Malpractice Review Board findings were not admissible and that even though the court stated it would explain "to the jury the reason for not introducing the Medical Malpractice Review Board findings," the jury was never told "that the review board hearing had not been admitted into evidence and should not be considered by the jury."

This issue is based on a misreading of the trial court's charge. The trial court charged the jury as follows:

Also, there were some findings of the Medical Review Board that was alluded to at the very beginning. It is not relevant and you are to disregard any remarks that were made about the findings of the Medical Review Board. It has no place in this lawsuit at this point just based on what the court told you about the standard of care.

This issue is without merit.

Plaintiffs' next issue is "[d]id the court err in granting defendant's motion for a

directed verdict relating to defendant's responsibility for injuries resulting from the first manipulation of Billy Johnson's head and neck on January 12, 1979."

Mr. Johnson argues that the trial court erred in directing a verdict as to the "first manipulation"[2] for three reasons: (1) that there was direct evidence of Dr. Lawrence's negligence, (2) that a rebuttable presumption arises under Tenn.Code Ann. § 29–26–115 where the instrumentality of harm is under the exclusive control of the defendant, and (3) that a "prima facie" case of negligence was made out when it was shown that Mr. Johnson became ill immediately after the first manipulation on January 12, 1979.

Mr. Johnson, in support of his argument that there is direct evidence of malpractice, relies, first, on the testimony of Dr. James T. Robertson, a neurologist who practices in Memphis, Tennessee. Dr. Robertson, without question, is a highly qualified neurologist and an expert in his field. In fact, each of the medical doctors who testified qualify as experts in their field and are competent to testify as to the standard of care required of physicians practicing their profession in the community.

However, here the defendant Dr. Lawrence is a chiropractor. In the complaint as amended, plaintiffs alleged that Dr. Lawrence on January 12, 1979, "failed to exercise the skill and competence in treating plaintiff as is reasonably required of members of his profession" and "failed to comply with the standard of care existing for chiropractors practicing their profession in the community at that time."

Tennessee Code Annotated § 29–26–115(a) provides as follows:

In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b):

(1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which he practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Subsection (b) of Tenn.Code Ann. § 29–26–115 provides that no person in a health care profession "shall be competent to testify in any court of law to establish the facts required to be established by subsection (a) unless he was licensed to practice ... a profession or specialty which would make his expert testimony relevant to the issues in the case...."

We must determine from the record whether there is competent proof from which the jury could have found a breach of the standard of care required of Dr. Lawrence and, if so, if that breach was the proximate cause of Mr. Johnson's injuries.

Dr. Robertson testified: "I have no idea about the ethics of practice of chiropractory in this state, and I am not a chiropractor." He also testified that he was "ignorant of what [chiropractors] teach in their schools."

Dr. James Bradshaw, a surgeon and family practitioner, testified: "I am not really clear on manipulation. We don't manipulate as physicians, and this would be without the scope of my practice and knowledge. I wouldn't have any knowledge of this type of therapy." He testified as to the standard of care which applied to medical doctors but admitted that he "wouldn't have any idea" regarding the standard of care to be followed by chiropractors.

Dr. Warren McPherson, a neurosurgeon, did not attempt to testify regarding the standard of care of chiropractors or what

---

**2.** We refer to the "first manipulation" as occurring when Dr. Lawrence treated Mr. Johnson on January 12th. The "second manipulation" occurred after Mr. Johnson was in distress and Dr. Lawrence manipulated Mr. Johnson, according to Dr. Lawrence, to pacify him.

would be a breach of the standard of care of a chiropractor.

■ Plaintiffs have failed to show by competent proof that Dr. Lawrence "acted with less than or failed to act with ordinary and reasonable care in accordance with" the "recognized standard of acceptable professional practice" of chiropractors in the community.

In fact, plaintiffs do not seriously contend that they have proved the community standard of care by chiropractors by the testimony of the medical doctors. However, they say they did prove the standard by Dr. Lawrence when he testified concerning the proper way to manipulate the head and neck. They rely on the following testimony:

A.  You just move the joint through its normal range of motion.

Q.  Do you mean you turn the head; is that what you are saying?

A.  Turn the head slightly in its normal range of motion.

Q.  When you use your fingers and hands in this fashion, what range of motion does the neck go through back there?

A.  Just its normal range. I hate to be vague; but as far as I know, nobody has ever determined how far is a normal range of motion, It is a physiological thing. And you just move it until it is tight, and that is as far as you touch it. That is as far as it goes.

Q.  Why do you only move it that far?

A.  Because there is no point in going any further. Because it is normal for it to go through this normal range of motion. When it becomes static there, that is where your trouble is. All you are trying to do is move an immobile joint.

Q.  What would happen if you moved it beyond its normal range of motion?

A.  It would make it sore.

They then argue that they proved a violation of that standard through the following testimony of Mr. Johnson.

Q.  Could you describe the traction device to your head?

A.  A traction machine. It is a strap that goes around your neck and goes also behind your neck, and, as you say, lay in a prone position on your back, and it is a pulling type of movement where as it pulls directly behind, it goes two or three seconds and I don't have—

Q.  How long were you left on that machine on that date?

A.  I would say the same amount of time, the three to five minutes.

Q.  Was Dr. Lawrence with you, or did he leave the room during that period of time?

A.  He left the room both times.

Q.  Upon returning to the room what did he do?

A.  Upon returning to the room he manipulated my neck, and again he got directly behind me, and I laid on my back, and he gave me a twisting movement to the left and to the right, and again he made a rather wrench type of movement to make sure he can go as far as he can go each way.

Q.  After turning your head and neck as far as it could go, as far as then applying further—

. . . .

A.  He went as far as he could, and probably again it was probably a half second just for that length of time to the left and then to the right. He made sure this movement would go both ways.

Q.  All right, sir. And after going as far as the movement could go both ways, did he stop at that point, or did he apply other pressure?

A.  There was a little pressure applied.

Q.  Was there a wrenching movement or a slow movement in between the two extremes?

A.  It was about this far (indicating), and when he got there, he made sure

that it went all the way as far as it could go, and then he went back to the right as far as it would go, and he applied a little pressure each way to make sure—

■ Even if it be conceded that Dr. Lawrence has testified to the chiropractic standard of care in the community for manipulation of the neck, we find nothing in Mr. Johnson's testimony that will satisfy the requirements of Tenn.Code Ann. § 29–26–115. He has not been shown to qualify as a witness who could testify that Dr. Lawrence acted with less than or failed to act with ordinary and reasonable care in accordance with the community standards for chiropractors. In fact, Mr. Johnson at no point testified that his neck was manipulated beyond the normal range of motion. We find nothing in his testimony to show that he knows or claims to know what the "normal range of motion" is.

The only expert testimony by a chiropractor was given by Dr. Lawrence who testified that he moved Mr. Johnson's neck through its "normal range of motion" on January 12th.

There is no competent testimony to show a breach of the standard of care applicable to Dr. Lawrence, a chiropractor.

■ Plaintiffs next argue that the trial court erred in directing a verdict as to the "first manipulation" and that they made out a "prima facie" case of negligence since Mr. Johnson became ill immediately following the manipulation of his head and neck by Dr. Lawrence. They rely upon *Ison v. McFall*, 55 Tenn.App. 326, 400 S.W.2d 243 (1964).

In *Ison* there was dicta to the effect that plaintiff could rely upon the fact that an injury followed manipulation. However, in 1975, the General Assembly enacted Tenn. Code Ann. § 29–26–115(c) which states: "In a malpractice action as described in subsection (a) of this section, there is no presumption of negligence on the part of the defendant."

The jury may not presume negligence from the fact of an injury alone.

■ Lastly, plaintiffs rely upon Tenn. Code Ann. § 29–26–115(c) which is as follows:

In a malpractice action as described in subsection (a) of this section there shall be no presumption of negligence on the part of the defendant. Provided, however, there shall be a rebuttable presumption that the defendant was negligent where it is shown by the proof that the instrumentality causing injury was in defendant's (or defendants') exclusive control and that the accident or injury was one which ordinarily doesn't occur in the absence of negligence.

They argue that the instrumentality was Dr. Lawrence's hands, that his hands were under his exclusive control, and that the "injury or accident is one which ordinarily does not occur in the absence of negligence."

Plaintiffs' only argument is that this section applies since defendant's hands were under his exclusive control. Nowhere in their argument do they attempt to show that the "injury or accident was one which ordinarily does not occur in the absence of negligence." Mr. Johnson suffered a stroke. There is no proof, and plaintiffs do not attempt to suggest, that strokes do not ordinarily occur in the absence of negligence. In fact, the testimony of the plaintiffs' expert witnesses shows that strokes occur in the absence of negligence.

Dr. McPherson testified that the most common cause of strokes is hardening of the arteries and that other causes include direct trauma, high blood pressure, and "a whole list of things." Dr. Robertson testified: "The major cause of occlusive stroke is hardening of the arteries." Dr. Bradshaw testified: "People are felled by strokes frequently for whatever cause" and that the factors include high blood pressure, overweight, and smoking.

We find nothing in this record to show that a stroke ordinarily does not occur in the absence of negligence. Plaintiffs' reliance on Tenn.Code Ann. § 29–26–115(c) is misplaced.

This issue is without merit.

Plaintiffs, by their next issue, say the trial court erred in "failing to grant plaintiffs' motion for a directed verdict made at the close of all the proof."

Plaintiffs rely on the same arguments in support of this issue as they did in arguing that the trial court erred in granting defendant's motion for a directed verdict. For the reasons we have heretofore set forth, we find this issue to be without merit.

■ By their next issue, plaintiffs contend that the trial court erred "in instructing the jury and later reinstructing during deliberations that the jury could not consider the defendant's first manipulation of plaintiff's head and neck on January 12, 1979 for any purpose."

The trial court charged the jury, in part, as follows:

It is necessary to bring the case to the perspective that I feel like it belongs. First off, I have directed a verdict which means that you will not be allowed to consider the cause of the stroke. The fact that Mr. Johnson had a stroke was not relevant, because under our law what is known as the standard of care of a physician or practitioner of the healing arts has been adhered to; and as long as he acts reasonable and complies with that standard of care, then he cannot be held liable.

So what the court is telling you is the cause of the stroke, from natural causes, high blood pressure, or some physical defect, or the first manipulation by Dr. Lawrence, is of no importance. That is not an issue for you to consider, because Dr. Lawrence, in the manipulation of the neck, it has not been shown that he did anything improper.

For that reason, you cannot decide the case of Dr. Lawrence, if you decide to do so, for that purpose. You are simply going to have to forget and not consider the cause of the stroke. That is not a question for you to determine. As I have said, that is based on the standard of care that practitioners of the healing arts are required to adhere to.

What I am going to tell you to do is to begin your deliberation from the second manipulation. If you recall, there is certain testimony that when the stroke was detected, that Dr. Lawrence either at the request of the plaintiff or on his own, depending on how you find the facts to be again, remanipulated the neck.

The question you are going to decide in this case is whether or not Dr. Lawrence, acting as a reasonably prudent chiropractor, should have known that that, in fact, was not the proper thing to do at that point in time and whether or not he did what a reasonably prudent chiropractor would have done under the same and similar circumstances.

If you find at that point in time when the second manipulation occurred that Dr. Lawrence was, in fact, negligent, then and only then can you find for the plaintiffs in this case.

During deliberations, the jury came back into court and the foreman stated: "Judge, we are hung up. There seems to be a question on our charge." The court then asked the jury what the question was, and one of the jurors replied:

Our charge is from the point he stated after the first manipulation on January 12 in his first manipulation and went out of the room, and Mr. Johnson starts having the stroke?

THE COURT: That's correct.

JUROR: Our charge is from the time Dr. Lawrence comes in. We have to prove negligence from the time he comes back in the room?

THE COURT: I got Dr. Lawrence and Mr. Johnson mixed up a while ago, but that is correct. That is what the Court instructed. You are not to consider the cause of the stroke.

JUROR: We are not to consider anything behind that, but from the time Dr. Lawrence comes back in the room?

THE COURT: That is correct. Based on what Dr. Lawrence did from the time of the second manipulation.

JUROR: The time he went in the room and found the situation that he was in after the first manipulation?

THE COURT: That's correct. Does that answer your question?

The charge, taken as a whole, and especially the foregoing quoted portion of it, allows the jury to begin its "deliberation from the second manipulation" only. The jury could not look to Dr. Lawrence's actions prior to the time he came back into the treatment room after Mr. Johnson was in distress. In essence, under the court's instructions, the jury could only look to Dr. Lawrence's actions as if he had never seen Mr. Johnson before entering the treatment room after Mr. Johnson was in distress.

Dr. Lawrence did not just happen upon and treat a person in distress. Mr. Johnson was Dr. Lawrence's patient. Dr. Lawrence knew the treatment he had rendered to Mr. Johnson. The jury should have been allowed, under proper instructions, to have considered the entire course of treatment rendered by Dr. Lawrence to Mr. Johnson and determine if in light of the course of treatment, Dr. Lawrence was negligent in the treatment rendered to Mr. Johnson after he found Mr. Johnson in distress.

This issue is sustained.

■ Plaintiffs' next issue is "[d]id the court err in failing to give plaintiffs' proposed jury instruction relating to the standards of a chiropractor who attempts to treat the condition outside his own field of practice."

Plaintiffs' proposed instruction is as follows: "I charge you that where a chiropractor steps out of his own field and into the field of medicine, he must be judged by the accepted standards in the field in which he enters."

Plaintiffs insist they were entitled to this instruction because Dr. Lawrence, at Mr. Johnson's request, performed the "second manipulation" when Dr. Lawrence admittedly knew that the "second manipulation" would not benefit Mr. Johnson. Plaintiffs argue that by doing something he knew

would be of no benefit, Dr. Lawrence "stepped out of his profession and into the medical profession."

We are unable to follow this argument. Mr. Johnson has failed to show that Dr. Lawrence purported in any way to act as a practitioner in the medical field. There is no evidence in the record to support a jury instruction such as that proposed by plaintiffs. Where there is no such evidence, the instruction should not be given to the jury. *See Strickland v. City of Lawrenceburg,* 611 S.W.2d 832, 837 (Tenn.App.1980).

This issue is without merit.

■ Plaintiffs, by their sixth issue, say the trial court erred "in instructing the jury concerning the proper standard of care and the sudden emergency doctrine."

The question before the jury was whether Dr. Lawrence was negligent in performing the "second manipulation." There is not one iota of evidence in the record that Dr. Lawrence was confronted with a sudden emergency when he performed the "second manipulation." In fact, he testified that he performed the "second manipulation" knowing that it would be of no help in relieving Mr. Johnson's physical symptoms but hoping it would relieve Mr. Johnson's anxiety. The trial court erred in charging the "sudden emergency doctrine" since there was no evidence in the record to support such a charge. *Strickland v. City of Lawrenceburg, supra.*

■ Plaintiffs' seventh issue is whether the trial court erred "in instructing the jury concerning unavoidable injury."

Dr. Lawrence requested, and the trial court instructed the jury, in part, as follows:

Now where a suit for damages is based upon negligence, it must appear from a preponderance of the evidence that the plaintiff's injury was the direct or proximate result of the defendant's negligence; that being the re-manipulation in this case. Without such proximate causation between negligence and injury, there can be no liability on the part of the defendant, Dr. Lawrence.

When an injury occurs, it does not necessarily follow that the defendant was negligent. Occasionally, an injury occurs without fault on the part of any individual concerned; that is, because of circumstances beyond the control of either party. Such injuries are said to be unavoidable.

In our law, except in a few rare situations, not here applicable, there can be no liability unless there is fault. It is not permissible to assume that the injuries never happened unless somebody was negligent, for they sometimes do so happen. In such case, the absence of proximate negligence means absence of liability.

The only issue before the jury was whether Dr. Lawrence negligently treated Mr. Johnson regarding the "second manipulation." Dr. Lawrence testified that he did the "second manipulation" knowing that it would be of no help to Mr. Johnson's physical ailment. Dr. Lawrence voluntarily, knowing, according to his testimony, that the second manipulation would be of no avail, performed the "second manipulation." If the "second manipulation" caused injury to Mr. Johnson, it certainly cannot be said that it was unavoidable. It was a voluntary act on the part of Dr. Lawrence.

There is no proof in the record to support the charge of unavoidable injury. In the absence of evidence to support such a charge, the trial court erred in so charging. *Strickland v. City of Lawrenceburg, supra.*

Plaintiffs, by their next issue, contend that the court erred "in instructing the jury concerning testimony of expert witnesses."

They complain of the following portion of the charge:

Certain people have testified by depositions and in person as experts. Now, an expert witness is one who possesses special or technical knowledge or skill upon the subject upon which he testified; that is, upon a subject with which ordinary men are not familiar. He differs from the ordinary witness in that he is permitted to express opinions as to the results of proven facts, although he may also testify as of the facts himself as may other witnesses. Expert opinions are not to be accepted as facts. Those opinions should be carefully weighed by the jury with regard to the expert's training, experience, and source of knowledge, as well as with regard to his prejudice if any appear. Expert witnesses are frequently paid special compensation by the party for whom they testify. Such compensation is entirely proper. Yet, because of it, the jury should receive the expert's testimony with caution and weigh it carefully.

Plaintiffs did not object to this instruction. In fact, plaintiffs acquiesced in the instruction.

Prior to instructing the jury, the trial court discussed each of the special requests with the attorneys out of the presence of the jury. In regard to the foregoing instruction, the following colloquy occurred:

THE COURT: Number 7, expert witnesses, I grant to you. Any objection to Number 7?

MR. EVANS: We concluded both sides liked that one better than the pattern. We didn't have any objections.

THE COURT: That's all the court is going to charge on expert witnesses.

Plaintiffs were specifically called on to object if they disagreed with the charge on expert witnesses, but they stood silent. Further, when Mr. Evans, one of Dr. Lawrence's counsel, stated to the court that both sides had agreed on this instruction, plaintiffs remained silent. If plaintiffs objected to the instruction, they had a duty to do so at that time.

While we do not hold that the charge was error, even if it were, plaintiffs cannot, by their silence, invite the court into committing error and then rely on that error. Tennessee Rule of Appellate Procedure 36(a) provides in part: "Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action

was reasonably available to prevent or nullify the harmful effect of an error."

This issue is without merit.

■ Plaintiffs' next issue is "[d]id the court err in allowing defendant's counsel during cross-examination of plaintiff's psychologist to refer to and assert as fact inadmissible hearsay statements regarding highly prejudicial and irrelevant matters outside the record in this cause."

Plaintiffs contend that the trial court erred in allowing defense counsel to cross-examine Dr. Copple, a psychologist, concerning the "Rosenhans study." Plaintiffs objected to certain questions and were overruled by the court. However, defense counsel then stated: "Dr. Copple, since you are not familiar with that study, I am going to withdraw that question at this time." Plaintiffs insist that the mere asking of the question was prejudicial.

The trial court, after this incident, on two separate occasions, instructed the jury as follows: "Ladies and Gentlemen of the Jury, you can't infer anything as being a fact from a question that is asked by an attorney. You can only infer something as being a fact, that being a responsbile witness. You can't infer a fact from a question, only from an answer."

We must assume the the jury followed the trial court's instruction unless there is proof to the contrary. If error was committed by defense counsel in asking the question, it was cured by the trial court's instruction.

■ Plaintiffs' next issue is "[d]id the court err in refusing to permit Dr. James Thomas Robertson's survey into evidence."

Dr. Robertson had conducted for the American Heart Association a survey among physicians "regarding the frequency of the incidence of or occurrence of like injuries observed by the physicians." The trial court excluded the following statement from Dr. Robertson's deposition.

Of the 300–odd responders to the questionaire that was sent out by the American Heart Association office to the limited group of people interested in stroke, there were in excess of 100 respondents from all over the country that had seen verterbral artery injury subsequent to manipulation of the neck.

Plaintiffs argue that this answer should have been allowed as it showed Dr. Robertson's qualification and knowledge, and was, therefore, not subject to the hearsay rule.

We hold that the foregoing was properly excluded. Dr. Robertson testified at great length concerning his qualifications. He testified at length concerning his activities in regard to research regarding strokes.

The excluded statement was offered to show that over 100 of those who responded to Dr. Robertson's questionaire "had seen verterbral injuries subsequent to manipulation." It can only be said that this statement was offered for the truth of the matter asserted.

The statement was subject to exclusion as "hearsay evidence, being based on alleged findings and statements of another doctor." *Patterson v. Kroger Co.*, 54 Tenn.App. 243, 252, 389 S.W.2d 283, 288 (1964).

This issue is without merit.

■ Plaintiffs' next issue is "[d]id the court err in permitting evidence of two blood pressure readings taken from Billy Johnson at the same time on a single day at some unidentified time previous to his injury."

Mr. Johnson testified that "to my knowledge or anything official, I have never had any high blood pressure of any kind. I don't think I have it today. Do you want to check it?"

The defendant called Dr. Thomas K. Gallagher, an optometrist, who testified that as a part of his practice he took the blood pressure of his patients. He testified that he belonged to a health spa operated by Mr. Johnson and that, while Mr. Johnson owned the spa, the manager, Edward Sellers, was "taking peoples' blood pressure to make sure that they were not in danger in coming in and taking part in the workout program." The evidence is

that blood pressure readings were routinely taken of persons who joined the spa. The evidence is that Mr. Sellers was getting a lot of "low readings" in taking blood pressure, and this concerned him. Mr. Sellers asked Dr. Gallagher to bring his blood pressure instrument to the spa and check it against the spa's instrument to see if the spa instrument was correct. Dr. Gallagher took his instrument to the spa and he and Mr. Sellers were in the office taking each other's blood pressure to see how the instruments correlated when Mr. Johnson came in to use the phone. When "Mr. Johnson sat down to use the phone, he put his arm out and told us to take his blood pressure." The diastolic reading for Mr. Johnson was quite high, and both Dr. Gallagher and Mr. Sellers thought it was "high for someone who was fit and all like Mr. Johnson." The evidence is that the diastolic readings on both instruments were about the same. This incident occurred while Eddie Sellers was still the manager of Mr. Johnson's health spa in Lebanon. The readings were taken before Mr. Johnson suffered the stroke in January of 1979, but the exact date was not stated.

Dr. Gallagher and Eddie Sellers both recommended that Mr. Johnson have someone else check his pressure, but his response to the recommendation was "well, he just sort of shrugged it off, like, 'Aw, there's nothing wrong with me; nothing could be wrong with my blood pressure.' It didn't impress him, it seemed like."

We are of the opinion that this testimony was admissible as impeachment testimony. Mr. Johnson testified that he had no knowledge that he had ever had any high blood pressure readings when, in fact, he had been informed that he did have high readings by both Dr. Gallagher and Mr. Sellers.

This issue is without merit.

■ Plaintiffs' next issue is "[d]id the improper conduct of the defendant's counsel, Mr. William Baird, deny plaintiffs a fair trial."

Mr. Baird has served the City of Lebanon as Mayor, served in the Tennessee State Senate, and practiced law in Lebanon, Wilson County, Tennessee, for many, many years. Mr. Baird, as co-counsel for Dr. Lawrence, did not examine or cross-examine any witness. Since all other members of Dr. Lawrence's defense team were from Nashville, we would surmise that Mr. Baird was employed as co-counsel to lend the defense a "homefolks flavor."

While Mr. Baird did not conduct any part of the trial, he continually interjected himself into the proceedings by his remarks. At one point, he went so far as to walk over to a juror while the trial was in progress and talk with the juror.

Plaintiffs then moved for a mistrial. Mr. Baird's explanation to the court was that he only asked the juror if he was ready to stay the rest of the night.

The trial court reprimanded Mr. Baird and indicated that it would declare a mistrial if there were any further incidents.

Throughout the trial, Mr. Baird made uncalled-for remarks in the presence of the jury, remarks that added nothing to the trial and were, in fact, demeaning to plaintiffs' counsel and plaintiffs.

These remarks were made to such an extent that after the proof was closed, one of Dr. Lawrence's co-counsel, Mr. May, requested the court "to submit to the jury a special instruction regarding the fact that any antics of counsel involved in this case or any statement by any counsel made in this case should not affect their verdict one way or the other."

While Mr. Baird may not have intended it, remarks made throughout this trial by him raised unfavorable inferences toward plaintiffs and/or plaintiffs' counsel, and there was no justification or excuse for the remarks. In fact, there can never be justification or excuse for a lawyer during a trial making remarks to jurors such as were made in this case. While under the circumstances Mr. Baird's actions may not have amounted to reversible error, this Court must condemn actions of this kind.

In view of our holding, we pretermit the remainder of plaintiffs' issues, all of which relate to damages.

It results that the judgment of the trial court in directing a verdict as to the "first manipulation" is sustained but, for the reasons set forth herein, the verdict of the jury is set aside, the judgment thereon is reversed, and the cause is remanded to the trial court for a new trial. Costs are assessed against the appellee Dr. Lawrence and the cause is remanded for the collection of costs and further proceedings.

TODD, P.J. (M.S.) and KOCH, J., concur.