IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
August 22, 2005 Session

# ARROW ELECTRONICS v. ADECCO EMPLOYMENT SERVICES, INC.

**A Direct Appeal from the Circuit Court for Shelby County**
**No. CT-002241-03      The Honorable John R. McCarroll, Jr., Judge**

---

**No. W2004-02595-COA-R3-CV - Filed October 20, 2005**

---

Plaintiff/Appellant, a computer distribution company, sued Defendant/Appellee, a temporary employment service, for damages resulting from a temporary employee's allegedly negligent act. The trial court found in favor of the Defendant/Appellee on the grounds that Plaintiff/Appellant had not met its burden of proof to show negligence. We affirm on the grounds that the temporary employee was the loaned servant of the Plaintiff/Appellant and, as such, Defendant/Appellee is not liable for the negligent act of the temporary employee.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and HOLLY M. KIRBY, J., joined.

Nicholas E. Bragorgos and John R. McCann of Memphis for Appellant, Arrow Electronics

James H. Stock and William C. Sessions of Memphis for Appellee, Adecco Employment Services, Inc.

## OPINION

Arrow Electronics ("Arrow," "Plaintiff," or "Appellant") is a computer distribution company. Arrow is located in a warehouse with several departments including a technical side (where computers are assembled) and a shipping and receiving department. Adecco Employment Services ("Adecco," "Defendant," or "Appellee") is a temporary employment staffing agency that provides temporary employees to other businesses. On May 1, 2001, Adecco entered into a "Temporary Staffing Services Agreement" (the "Agreement")  with Arrow whereby Adecco would provide temporary employees as required by Arrow to work in Arrow's warehouse. Pursuant to the Agreement, in November 2001, Arrow requested that Adecco provide them with forklift operators and Adecco assigned Kenneth McCurdy ("McCurdy") to Arrow.

McCurdy was assigned to Arrow's receiving department. In December of 2001, Arrow had approximately 300 employees. Reggie Hoyle ("Hoyle") was an Arrow "team lead," with approximately 10 to 15 people under his direct supervision, including McCurdy. On January 4, 2002, McCurdy was working in the receiving department at Arrow operating a forklift and Hoyle was his immediate supervisor. At approximately 3:30 p.m., Hoyle instructed McCurdy to begin cleaning up as it was close to quitting time. While McCurdy was sweeping and cleaning up, Hoyle was moving a computer system with a forklift. Hoyle testified that he heard a "boom" and knew that something had been dropped. Hoyle went to the area where he had heard the noise and saw McCurdy on a forklift and one of the computer units was lying on the ground. McCurdy advised Hoyle that he had picked up the computer unit so that he could clean and sweep the area. The dropped computer was a two-unit set with one unit taller than the other. At the time of the incident, the forks of the forklift were approximately 8 inches off the ground. The computers were very heavy and had a tendency to tip over easily.

On January 7, 2002, Adecco received a request from Arrow that Adecco reassign McCurdy because he had had too many small accidents at Arrow. McCurdy was subsequently reassigned by Adecco.

On April 21, 2003, Arrow filed a "Complaint for Property Damage" (the "Complaint") against Adecco. The Complaint reads, in pertinent part, as follows:

> 2) Kenneth McCurdy was an employee of the Defendant Adecco on or about January 4, 2002, the date of the incident that is the subject of this lawsuit.
>
> *        *        *
>
> 5) On or about January 4, 2002, Kenneth McCurdy, in the context of the work he was performing for the Plaintiff, was specifically instructed by personnel working for the Plaintiff not to attempt to move a certain IBM computer.
>
> 6) On or about January 4, 2002, the Defendant McCurdy, negligently, and in direct contradiction of previous instructions by the Plaintiff, attempted to move an IBM computer with a forklift, and said computer fell to the ground causing extensive property damage.
>
> *        *        *
>
> 8) Any acts of negligence committed by Kenneth McCurdy are directly attributable to the Defendant Adecco per the doctrine of *respondeat superior*.

On November 21, 2003, Adecco filed its Answer, in which it denied liability for the damaged computer.

On December 15, 2003, Arrow filed "Plaintiff's Motion for Partial Summary Judgment" asserting that it was entitled to summary judgment on the issue of liability. On May 26, 2004, Adecco filed a "Motion for Summary Judgment," in which it asserted that Adecco "cannot be held liable for the acts of Kenneth McCurdy under the doctrine of *respondeat superior*." The "Motion for Summary Judgment" was supported by a Statement of Undisputed Facts, a Memorandum of Law, depositions and the Affidavit of Melissa Willie, Area Vice President for Adecco. On June 15, 2004, Arrow filed "Plaintiff's Response to Defendant's Statement of Undisputed Material Facts" and "Plaintiff's Reply to Defendant's Motion for Summary Judgment."

The case was heard by the trial court, sitting without a jury, on July 6, 2004. At the beginning of the hearing, the trial court heard oral arguments regarding the respective motions for summary judgment. The trial court subsequently denied both motions by separate Orders both entered on September 13, 2004. At the close of the parties' proof on July 6, 2004, the trial court held that Adecco was the employer for purposes of *respondeat superior* but denied liability based upon the trial court's finding that Arrow had not met its burden of proof as to negligence. Following its ruling from the bench, the trial court entered its "Order on Trial Verdict" (the "Final Order") on September 13, 2004.

On July 9, 2004, Arrow filed "Plaintiff's Motion to Alter or Amend Judgment," which was supplemented on July 12, 2004. The trial court denied Arrow's motion by Order of September 13, 2004. On October 11, 2004, Arrow filed its "Notice of Appeal," in which it appeals from the trial court's denial of its motion to alter or amend and from the Final Order. Arrow raises the following issues for review as stated in its brief:

> I. As to the Appellant's burden of proof, did the trial court err by applying a standard greater than "a preponderance of the evidence"?
>
> II. Did the trial court err in its findings regarding Kenneth McCurdy's negligence and the resulting damage to Arrow's property?
>
> III. Did the trial court err in denying Appellant's motion to alter or amend judgment?[1]

On October 12, 2004, Adecco also filed a "Notice of Appeal," in which it appeals from the September 13, 2004 Order denying its motion for summary judgment. Adecco raises the additional

_____

[1] From our review of the record, it appears that neither party relied upon the Indemnification Clause(s) of the Agreement. The trial court did not apply the Clause so as to indemnify Adecco against damage to Arrow's property. At any rate, no issue has been raised concerning the Indemnification Clause; therefore, we will not consider same.

issue of whether the trial court erred in denying Adecco's motion for summary judgment as there were no material facts in dispute. We note, however, that when the trial court's denial of a motion for summary judgment is predicated upon the existence of a genuine issue as to a material fact, the overruling of that motion is not reviewable on appeal when subsequently there has been a judgment rendered after a trial on the merits. *Hobson v. First State Bank*, 777 S.W.2d 24, 32 (Tenn. Ct. App. 1989); *Mullins v. Precision Rubber Products*, 671 S.W.2d 496, 498 (Tenn. Ct. App.1984); *Tate v. County of Monroe*, 578 S.W.2d 642, 644 (Tenn. Ct. App.1978). From the record before us, it appears that the trial court's denial of both motions for summary judgment is predicated upon the existence of disputed material facts. Since the trial court denied the motions for summary judgment but subsequently decided the case on the merits, this Court will not review the trial court's decision on summary judgment.

At the close of the proof in this case, the trial court made the following relevant findings from the bench:

> ...These documents [i.e. the Agreement] indicate that the McCurdy gentleman was, in fact, an Adecco employee. I don't get the borrowed servant or loaned servant doctrine.... I don't think that McCurdy is what's known as a "Referred Employee". I think he is an employee of Adecco. And the only question that I've got in my mind is whether he was or wasn't negligent. And I've got a real question about that.

> \*                    \*                    \*

> ...If he were negligent, then I think that Adecco would be responsible for his negligence....

> \*                    \*                    \*

> All right. As I understand you, I think based on my reading of the contract, and particularly paragraph 12, that if, in fact, I were satisfied that Mr. McCurdy was guilty of some negligence, then it would be Adecco's responsibility to reimburse Arrow Electronics. Based on the proof I don't think that Arrow Electronics carried the burden of proof as to negligence. Therefore, it would be a judgment for the defendant.

We first note that, since this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm absent error of law. *See* Tenn. R. App. P. 13(d). Furthermore, the weight to be given to all the evidence is a question to be determined by the trier of fact. *Stovall v. Clarke*, 113 S.W.3d 715 (Tenn. 2003).

On appeal, Arrow contends that the trial court erred in finding that Arrow had not met its burden of proof to show that McCurdy's actions were negligent. Specifically, Arrow asserts that, because Adecco offered no rebuttal evidence, the trial court, in making its finding, held Arrow to a standard higher than preponderance of the evidence. We have reviewed the entire record and the most that can be said of all the evidence is that Arrow has offered proof tending to show that the computer system fell approximately eight (8) inches from the forklift operated by McCurdy to the warehouse floor and that this fall caused substantial damage to the system; Adecco has offered no evidence to rebut Arrow's evidence and no evidence from which we may infer a different cause. That being said, it is well settled in Tennessee that negligence may not be presumed from the mere fact of injury. *Johnson v. Lawrence*, 720 S.W.2d 50, 56 (Tenn. Ct. App.1986). In an action for negligence, the plaintiff must establish by a preponderance of the evidence that: (1) the defendant owed the plaintiff a duty of care; (2) by engaging in conduct which fell below that standard of care, the defendant breached that duty; (3) plaintiff suffered an injury; (4) defendant's conduct was the cause in fact of the injury; and (5) defendant's conduct was the legal, or proximate, cause of the injury. *See, e.g., Wood v. Newman, Hayes & Dixon Ins. Agency*, 905 S.W.2d 559, 562 (Tenn.1995); *Waste Mgmt ., Inc. v. South Central Bell Telephone Co.*, 14 S.W.3d 425, 430 (Tenn. Ct. App.1997). However, in a civil case depending on circumstantial evidence it is sufficient for the party having the burden of proof to make out the more probable hypothesis and the evidence need not arise to that degree of certainty which will exclude every other reasonable conclusion. *Bryan v. Aetna Life Ins. Co.*, 130 S.W.2d 85 (Tenn. 1939); *Law v. Louisville & N.R. Co.*, 170 S.W.2d 360 (Tenn. 1943).

Although Adecco offers no rebuttal evidence to counter Arrow's circumstantial evidence that McCurdy was negligent in his handling of the computer system, the trial court is not obligated to take that evidence as true based merely upon the fact that it is uncontested. The weight to be given to all the evidence is a question to be determined by the trier of fact. *Stovall v. Clarke*, 113 S.W.3d 715 (Tenn. 2003). The fact that a trial court gives little or no weight to certain evidence (regardless of whether it is rebutted) is not, in and of itself, an indication that the trial court is holding the proponent of that evidence to a higher standard than the law allows. That being said, we concede that the question of whether Arrow has met its burden of proof on the issue of negligence is a close one. Nonetheless, even if we assume *arguendo* that Arrow's burden is satisfied, and that McCurdy is guilty of negligence in this matter, our inquiry is not concluded. If McCurdy is negligent, then the question still remains of who is responsible for the damage caused by his negligence. Although the trial court, as set out above, found that the borrowed servant or loaned servant doctrine is not applicable to this case, we find that the loaned servant doctrine is dispositive in this matter.

Tennessee recognizes the "loaned servant" doctrine, under which "[a]n employee of one employer may become the servant of another and shift the liability for his negligent acts to the second employer." *Parker v. Vanderbilt Univ.*, 767 S.W.2d 412, 416 (Tenn. Ct. App.1988) (citing *Richardson v. Russom Crane Rental Co.*, 543 S.W.2d 590 (Tenn. Ct. App.1975)). The test to determine whether an employee is a loaned servant of another employer has been set out in *Gaston v. Sharpe*, 168 S.W.2d 784 (Tenn. 1943). In *Gaston*, the Court said:

[A] servant at a particular time may remain under the control of his general employer for some purposes and yet be under the control of a special employer for others. Likewise it sometimes happens that a particular work in which the servant is engaged may be properly considered as the work or business of both the general employer and the special employer.

The question is difficult. It is considered at some length in Restatement of Agency, § 227. We take the following from Restatement as a satisfactory rule: "Since the question of liability is always raised because of some specific act done, the important question is not whether or not he remains the servant of the general employer as to matters generally, but whether or not, as to the act in question, he is acting in the business of and under the direction of one or the other. It is not conclusive that in practice he would be likely to obey the directions of the general employer in case of conflict of orders. The question is as to whether it is understood between him and his employers that he is to remain in the allegiance of the first as to a specific act, or is to be employed in the business of and subject to the direction of the temporary employer as to the details of such act. This is a question of fact in each case."

168 S.W.2d at 786.

In *Gaston*, the Court concluded that the question of whether a servant of one employer has become the servant of another is generally a question of fact for the jury. However, in *Parker v. Vanderbilt Univ.*, 767 S.W.2d 412 (Tenn. Ct. App. 1988), the Court stated that:

As we have discussed above, whether a servant of one employer has become the servant of another is a question of fact. *Gaston v. Sharpe*, 179 Tenn. at 614, 168 S.W.2d at 786. Ordinarily, that determination would be for the jury. However, in this case, the relationship between the two hospitals is governed by a written agreement. The interpretation of an unambiguous written agreement is a question of law for the court. *Merritt v. Nationwide Warehouse Co., Ltd.*, 605 S.W.2d 250, 255 (Tenn.Ct.App.1980).

*Id*. at 416.

The *Vanderbilt* Court went on the conclude that:

The agreement between Vanderbilt and General provides that the residents, as members of the medical staff, were accountable solely

to General; General had the right to approve the assignment of all medical staff personnel and all residents were to be supervised by and accountable to General.

*                              *                              *

In light of the undisputed terms of the written agreement, we hold that the Vanderbilt doctors were the loaned servants of General at the time of the operation on Mr. Parker. Therefore, any negligence on the part of the surgical team could not be imputed to Vanderbilt.

*Id.* at 417.

In the case at bar the Agreement between Adecco and Arrow reads, in pertinent part, as follows:

4.1 Assigned Employees [i.e. McCurdy] are employees of Adecco and shall not be considered or treated as employees of Customer by the parties, except to such extent as required by applicable law. Customer [i.e. Arrow] shall not engage in actions that would make Assigned Employees common law employees of Customer.

4.2 Customer will adequately instruct, assist and supervise Assigned Employees in performing the agreed upon duties in an attended environment that contains proper internal procedures and safeguards. Customer will direct, control and supervise the details of the work performed by Assigned Employees.

4.3 Customer shall provide any general or specific safety training necessary to perform the assignment, including safety information regarding exposures to hazardous substances. Customer shall insure that Assigned Employees use any protective equipment necessary to perform the assignment safely.

*                              *                              *

4.5 When an Assigned Employee is to render services at Customer's premises, Customer shall provide, a suitable place for Assigned Employees to work in the performance of the services required by the assignment....

*                              *                              *

4.7 Customer shall not entrust Assigned Employees with cash, checks...or other valuables unless Customer executes the cash indemnity agreement attached hereto as Exhibit A.... Nor shall customer request or permit Assigned Employee to use any vehicle, regardless of ownership, in connection with the performance of Services for Customer unless Customer executes the client driver's release attached hereto as Exhibit B....

\*                              \*                              \*

4.10 Nothing contained in this Agreement shall entitle Assigned Employees to any direct or indirect benefits or compensation from Customer. As a condition of their assignment, Assigned Employees shall be required to acknowledge in writing that they are not entitled to participate in any of Customer's benefit plans....

\*                              \*                              \*

5.1 Adecco will recruit, interview, select, hire personnel who, in Adecco's judgment, are qualified to perform the services required by Customer.... Adecco shall have the sole responsibility to discipline, set the pay rates of, and terminate its employees assigned to Customer.

By its plain language, the Agreement between Adecco and Arrow establishes that McCurdy remains the employee of Adecco as to matters generally, but, as to any work done for Arrow, he is acting in the business of and under the direction of Arrow. Therefore, under the authority outlined above, and pursuant to the plain language of the Agreement, McCurdy is the loaned servant of Arrow and, as such, Arrow would be liable for any negligence on the part of McCurdy in performing his duties for Arrow. However, despite the plain language of the Agreement, the question still remains as to whether the Agreement was being followed at the time of the incident giving rise to this litigation (i.e. whether McCurdy was actually under the direction and control of Arrow at that time).

It is undisputed that McCurdy was assigned to Arrow as a forklift operator and general worker in the shipping/receiving warehouse. Although the forklift, and all other equipment used by McCurdy, was provided by Arrow, the reasoning in certain cases where both the employee and the equipment of another are used is applicable to the case at bar. In **Armoneit v. Elliott Crane Service, Inc.**, 65 S.W.3d 623 (Tenn. Ct. App. 2001), this Court stated that:

> [w]here a general employer rents out a machine and employee to operate it, the courts generally infer that the operator remains in the service of his or her general employer on the assumption that the temporary employers only control what the servants do, not how they

-8-

do it. Restatement (Second) of Agency § 227 cmt. c; *Handbook of the Law of Agency* § 86A, at 147. Nevertheless, the equipment operator becomes the temporary employer's servant for the purposes of a specific act when the temporary employer directs the servant on the details of how to accomplish the act. **Gaston v. Sharpe**, 168 S.W.2d at 786; **Richardson v. Russom Crane Rental Co.**, 543 S.W.2d at 592; Restatement (Second) of Agency § 227 cmt. d; *Principles of Agency* § 36, at 46.

*Id*. at 629.

Likewise, in **Gaston v. Sharpe**, *supra*, the temporary employer rented a dragline and its operator. The site foreman in **Gaston** signaled the operator to allow slack in the cable so that the plaintiff could adjust it. The operator either misunderstood the directions or negligently attempted to comply, with the unfortunate result that the machine dropped a 2,000 pound hammer on the plaintiff's leg. **Gaston v. Sharpe**, 168 S.W.2d at 784-85. Reasoning that the foreman controlled the operator by directing him to slacken the cable, the Tennessee Supreme Court upheld the trial court's directed verdict that the operator was the borrowed servant of the temporary employer when performing the specific act that injured the plaintiff. **Gaston v. Sharpe**, 168 S.W.2d at 786; **Richardson v. Russom Crane Rental Co.**, 543 S.W.2d at 592 (holding that a crane operator is the borrowed servant of a temporary employer who directs the operation of the crane).

In the instant case, both parties attempted to locate McCurdy to testify in this matter but he could not be found. Consequently, the only testimony concerning the events of January 4, 2002 came from Reginald Hoyle, the "team lead for the [Arrow] receiving department," and from Carl David Calcamuggio, the facilities manager for Arrow at the time of the incident. From Mr. Hoyle's testimony, it is clear that McCurdy was under his supervision and control during his tenure at Arrow, to wit:

> Q. ...[W]ere you Mr. McCurdy's supervisor?
>
> A. I was the team lead.
>
> Q. How many people were part of your team?
>
> A. Well, about approximately anywhere from 10 to 15 people, somewhere in that area.
>
> Q. Was Mr. McCurdy one of those?
>
> A. Yes.
>
> *                              *                              *

Q.  If [McCurdy] were operating the forklift and you wanted him to do something different, did you have to call anybody to change what he was doing?

A.  No.

Q.  If you wanted Mr. McCurdy to unload one of the trucks by hand rather than forklift, could you do that?

A.  Yes.

Q.  And what would you have to do?

A.  Basically, I would just tell him–according to what the truck would have, you know, it's most things the forklift operator, because it's on pallets and it's pretty heavy, but I would say, for example, if you were working the back of a UPS truck and they've got a bunch of small boxes in the back of it, I wouldn't tell him to drive up there with a forklift, I would tell him we would unload the truck by hand.

Q.  You would just go to Mr. McCurdy and say–

A.  I would go directly to him.

Q.  And say, "Kenneth, I want you to unload this truck by hand"?

A.  Correct.

This portion of Mr. Hoyle's testimony indicates that, generally, Arrow exercised control over what work McCurdy did and how he performed those duties.  Mr. Calcamuggio corroborated Mr. Hoyle's testimony.  He stated that Adecco had no supervisor on site to oversee McCurdy's work and that Arrow retained a supervisory role over McCurdy, to wit:

Q.  While the employee was there as a special employee with Arrow, you also directed what he did while he was on site?

A.  That's correct.

Q.  And supervised whatever function, whatever job it was that he was performing?

A.  His performance would be supervised or overseen by...in this case Reggie Hoyle, the team lead in receiving.

The respective testimonies of Messrs. Hoyle and Calcamuggio provide further evidence (along with the Agreement, *supra*) that McCurdy was Arrow's loaned servant because Arrow exercised supervision and control over McCurdy in terms of the specific jobs he performed while at their warehouse. While their statements indicate that McCurdy was generally under the supervision of Arrow, the question still remains as to whether McCurdy was under the direction of Arrow at the time of the incident and, indeed, whether McCurdy was actually following said direction(s) at that time. Concerning the specifics of what happened on the day of the incident giving rise to this litigation, Mr. Hoyle testified, in relevant part, as follows:

Q. All right. Do you recall the incident that was January the 4th of 2002 involving a gentleman named Kenneth McCurdy?

A. Yes, I do.

Q. All right. First of all, tell us, what do you recall about that particular date? Describe the event that took place and tell us about that.

A. It was late, toward the evening, time to go home basically. We had a couple of systems that was built during the course of the day, and our job at that time was whenever they were brought to receiving, we was supposed to store those systems up, and basically that was it. But that particular day, there was about two to three systems on the floor and I was moving them. I remember telling Kenny...to get ready to go home. Basically, it's clean up, which is basically grab a broom, clean up the receiving docks, closing the receiving doors, make sure they were locked. So that's part of cleaning up. And I was storing away some systems. I was the person who was storing them away.

Q. Whose job was it [to] store away these systems?

A. Well, it was two people that was more experienced with the particular system that we was storing away.

Q. Who was that?

A. That was me and another person....

Q. Okay. Please continue. What happened?

A. And I do remember Kenny...was asking me could he help. And I told him no, because of the fact that he wasn't experienced in moving this system. Ain't nobody moving them except two people,

-11-

me and another person. And so I told him basically to go clean up, get ready to go home. And he said, "Okay." So I saw him grab a broom and everything. And as far as I was concerned, he was cleaning up. I took one system and I was heading down the aisle where you place the systems at. And as I was traveling, I was putting away a system, I heard a big boom. And that tell me somebody dropped one.

Q. Okay.

A. Shouldn't be anyone moving them. So when I came back to where I heard the noise, there was Kenny on the sit-down forklift.

Q. Was Kenny supposed to be on a forklift at that time?

A. At that time, no, he [was] supposed to have been just cleaning up.

Q. So what happened?

A. Anyway, he was on a sit-down forklift.... And so I got to the location, I saw Kenny trying to pick up this system. And he had the forks up high. He looked at me, I looked at him. And I asked him, I mean "Why did you get on it, why are you moving this thing," and he basically said he was moving it because he wanted to sweep that area....

From this testimony, it is clear that, at the time of the incident, McCurdy was under the supervision of Hoyle. However, there is some question as to whether McCurdy disobeyed Hoyle's directives. The "Incident Report Form," filed four days after the incident and admitted, at the hearing, as Exhibit 3 states that:

According to the employees who were present when the incident occurred, Kenneth was told by Reggie Hoyle (Team Lead), not to move the product. Apparently he forgot, and tried to move anyway. Employees present were Diann Davis and Raymond Long. When talking to Reggie he confirmed that he told Kenneth not to move the product, and that he would do it himself.

Neither Diann Davis nor Raymond Long testified at the hearing. However, a close reading of Mr. Hoyle's testimony indicates that McCurdy's actions did not necessarily contradict the instructions he was given. Hoyle testifies that he told McCurdy that McCurdy could not help with the actual storing of the systems since McCurdy was not "experienced in moving this system." McCurdy was instructed to "clean up." Following the incident, Hoyle testified that McCurdy said he had moved

-12-

the system "because he wanted to sweep that area...." Since McCurdy, by his own admission, was attempting to accomplish the task set for him, we cannot say that his actions constitute a personal frolic, a deviation, or a detour from Hoyle's instructions. Rather, we find that this situation is more akin to that in *Gaston* where the employee either misunderstood the directions, forgot the directions (as indicated in the "Incident Report Form," *supra*), or negligently attempted to comply with the directions. As in that case, the supervisor (i.e. Hoyle) controlled McCurdy by directing him to clean up and McCurdy either misunderstood how that task was to be performed, forgot that he was not supposed to move the system, or negligently attempted to comply with Hoyle's instructions. Whether misunderstanding, forgetfulness, or negligence, we find that McCurdy was the loaned servant of Arrow when performing the specific act that caused the injury in this case. Although we arrive at the trial court's conclusion that Adecco is not liable for any negligent acts of McCurdy, we do so upon different grounds. Nonetheless, it is well established in Tennessee that this Court will affirm a decree correct in result but rendered upon different, incomplete or erroneous grounds. *See Hopkins v. Hopkins*, 572 S.W.2d 639 (Tenn. 1978); *Gamblin v. Town of Bruceton*, 803 S.W.2d 690, 693 (Tenn. Ct. App. 1990).

For the foregoing reasons, we affirm the Final Order of the trial court. Costs of this appeal are assessed against the Appellant, Arrow Electronics, and its surety.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.