IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 21, 2018 Session

## ANGIE RENEE LARSEN v. GEORGE GIANNAKOULIAS

**Appeal from the Chancery Court for Williamson County**
**No. 44033    Deanna B. Johnson, Judge**

_____

### No. M2017-00428-COA-R3-CV

_____

This is a divorce case. Husband/Appellant appeals the trial court's decision regarding: (1) the parenting plan for the minor children; (2) the enforcement of the parties' prenuptial agreement in its denial of Husband's request for alimony and a portion of Wife's retirement accounts; and (3) the designation and division of property. Under the doctrine of *lex loci contractus*, we vacate the trial court's order enforcing the waiver of spousal support provision of the parties' prenuptial agreement. The trial court's order is otherwise affirmed, and the case is remanded for determination of whether alimony is warranted in this case and, if so, the amount thereof.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Vacated in part, Affirmed in Part, and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and BRANDON O. GIBSON, J., joined.

George Giannakoulias, Brentwood, Tennessee, appellant, pro se.

Edward P. Silva and William P. Holloway, Franklin, Tennessee, for the appellee, Angie Renee Larsen.

## OPINION

### I. Background

Appellant George Giannakoulias ("Husband") and Appellee Angie Renee Larsen ("Wife") met in 2006 and married on August 14, 2008. Three children were born to the marriage; at the time of the hearing, the children were ages eight, seven, and five.

Husband graduated from the University of South Florida. Husband's work history has been sporadic. After graduating, Husband worked at a pizza restaurant and at a department store. In approximately 2002, Husband obtained his real estate license in Florida and worked as a realtor from 2002 to 2008. Husband was paid on commission but did not file a tax return during his tenure selling real estate.

Wife graduated from the University of Wyoming with a degree in math in 1992. She graduated from the University of Mississippi medical school in 1996 and completed a fellowship in breast surgical oncology in 2010. When the parties met in 2006, Wife was employed as a general surgeon and had her medical practice in Nashville. Husband testified that he was "winding down" his real estate career in Florida, where he resided at that time. In February 2007, Husband moved in with Wife in her home in Brentwood. Husband did not work during this time. When Wife became pregnant with the parties' first child, she decided that her medical practice was too demanding. Wife closed her medical practice in Tennessee, and the parties moved to Florida, where the child was born in November 2007.

In February 2008, Wife accepted a position in New Mexico, and the parties moved there. Husband stayed at home with the baby and worked at day trading. Prior to the parties' marriage, Husband had earned approximately $30,000 as a "day trader." Wife's work schedule was flexible, and she was able to come home to breast feed the child. Wife testified that she rarely worked overnight shifts, and when she was on call, she was rarely paged. Wife subsequently changed jobs, and the parties moved from a small New Mexico town to Albuquerque. Husband did not work during this time. Wife's new position was more demanding, but her mother would frequently come to stay with the family to help care for the baby.

In the summer of 2008, the parties decided to marry. Prior to marrying, the parties discussed the need for a pre-nuptial agreement. Wife testified that she would not have married Husband without a pre-nuptial. Wife wanted to protect real property she owned for the benefit of her mother and father, and she wanted to be protected against a lawsuit that was pending against Husband in Pennsylvania. Husband downloaded a pre-nuptial agreement from the internet, and the parties executed the document. The parties married in Colorado in August 2008.

In May 2009, Wife started a fellowship in breast cancer oncology in Pennsylvania, and the parties moved there. Wife was pregnant with the parties' second child. Initially, Wife worked part time but later started a full-time schedule. Her salary was $50,000, and she and Husband discussed the need for him to help out financially. Husband had told Wife that he had a $300,000 line of credit on the Florida house he owned with his aunt. Prior to the marriage, Husband indicated that there was nothing outstanding on the line of credit. After the parties' second child was born in July 2009, Wife suggested Husband use some of his equity in the Florida home to support the family during Wife's

fellowship.  At this point, Wife discovered that Husband had drawn all of the $300,000 line of credit on the Florida house and had lost the full amount on day trading in 2008 and 2009.  Accordingly, Husband had to service the Florida debt monthly in order to keep the house that he co-owned with his elderly aunt and where she lived.  The trial court found that, during the marriage, Husband had sent some $72,000, in marital funds, to Florida to pay the line of credit.  Despite this debt, Husband did not obtain employment outside the home.

By July 2010, Wife finished her fellowship, and the parties moved to Chattanooga, where Wife was offered a job.  When Wife was pregnant with the parties' third child, she was "transitioned out" of her job.  She reached a settlement with the Chattanooga employer and used the money for the family to live on.  After Wife left the Chattanooga job, the family moved to Florida, where the third child was born in August 2011.  After the third child was born, Wife stayed home to recover and take care of the baby.  During this time, the family lived off Wife's settlement from the Chattanooga job.  Husband did not work.

At the end of September 2011, the parties moved to Ohio, where Wife had found a job.  In Ohio, Wife worked regular business hours five days a week.  Husband stayed home with the children, who were four, two, and an infant.  During this time, Wife's mother stayed with the family often to help care for the children.  The family lived in Ohio for approximately one year.  In October 2012, Wife returned to practice in Nashville, and the family moved back to Tennessee.  Wife's initial employment contract was for three years, and she was salaried at $325,000 per year.  In year three, Wife went to a "productivity based" pay scale.  At the time of the trial, Wife made between $225,000 and $250,000 per year.

After the family returned to Tennessee, the older children started Montessori school.  The youngest child was not yet in school, so Husband stayed home to care for her.  Wife's father, who lives in Tennessee, took an active role in picking up the older children from school.

On or about February 8, 2013, the Internal Revenue Service ("IRS") filed a Notice of Federal Tax Lien against Husband, indicating that he owed unpaid taxes of $3,981,778.67.  Although Husband's name was listed on the tax lien, and it was solely for Husband's unpaid taxes, Husband listed one of Wife's pre-marital homes as his address, and the IRS placed the lien on Wife's home.  In 2013, Husband earned commissions for his relator service in selling Wife's property.  Husband received a 1099 form, but he did not file taxes on this income.  Husband used $17,000 of these fees to make a payment on the Florida line of credit.  On or about April 19, 2013, the IRS issued a letter, stating that it had determined that Husband does not have the ability to pay the money owed.  The letter further states that the IRS has "temporarily closed" Husband's case but that it may re-open the case in the future.  The letter clearly states that Husband "still owe[s] the

- 3 -

money to the IRS," and notes that the IRS "will continue to add penalties and interest to [Husband's] account" and will offset the amount owed by "applying future tax refunds to the amount. . . ." The letter cautions Husband that "it is very important that you file all future tax returns and pay any amounts you owe on time." Despite the tax lien and subsequent letter, Husband testified that, although he earned commissions for real estate sales and from the operation of a bed and breakfast, *see infra*, he did not file a tax return between 2013 and the date of the hearing in 2016.

On June 21, 2013, Wife purchased an operating bed and breakfast in Brentwood. Initially, the bed and breakfast was to be the family's primary residence while it continued to operate as a business. Wife paid $876,000 for this property. A few weeks before closing, Husband found a different home in Brentwood and decided that this should be the marital home, with the bed and breakfast operating solely as a business. Wife purchased the second home on July 10, 2013 and paid $565,000. Wife was the sole obligor on the mortgages.

After firing the manager of the bed and breakfast, the parties decided that Husband would run the business. At this time, the parties' youngest child had started school, and Husband was able to work. However, because of his tax issues, Wife opened a bank account at Pinnacle Bank, which was to be the operating account for the bed and breakfast. The bed and breakfast initially ran as a sole proprietorship, with Wife being the proprietor. Despite this fact, Wife had very little to do with the bed and breakfast. Husband used Wife's name and social security number to run the business. Wife was unaware that her information was being used. However, in 2015, Wife received a 1099 form with her name and social security number. The 1099 was from a credit card processing company used by the bed and breakfast. On her accountant's advice, Wife proposed that Husband form an LLC for the bed and breakfast and enter into a contract with her for the running of the business. Husband formed an LLC on January 1, 2015; however, the parties fought over the lease. Husband initially refused to sign a lease; however, in June 2015, Husband signed a lease, which the parties made retroactive to January 2015. Under the lease, Husband's LLC was to pay $4,200 per month in rent. According to her testimony, Wife has never seen any records for the bed and breakfast except for the Pinnacle Bank statements. As of the date of trial, Husband had not filed taxes for any income he received from the bed and breakfast. He also did not pay state sales taxes, which resulted in a state tax lien on the marital home.

On April 8, 2015, Wife filed a complaint for divorce in the Chancery Court for Williamson County ("trial court"). Wife propounded discovery on Husband. As found by the trial court in its final order, "[t]he procedural history of this case is replete with struggles of Wife and her attorney to obtain Discovery from Husband." The trial court noted that "Wife's attorney propounded Discovery on Husband which he refused to answer, was late in answering, or only half-way answered," thus requiring wife to file several motions to compel. In addition, the trial court noted that, during the pendency of

the divorce case, Husband had hired and fired four attorneys. In short, the litigation was protracted.

On or about November 3, 2015, Wife notified Husband that his LLC was in breach of the lease. Specifically, Husband had not paid the rent on the bed and breakfast for October and November, 2015, and Wife notified him that she was terminating the agreement pursuant to the contractual language. Nonetheless, as stated in the trial court's order, "[o]n November 13, 2015, [Wife] agreed and the court ordered that [Husband] be allowed to reside in the Innkeeper Room Suite at the [bed and breakfast] property. . . ." Husband left the marital home in November 2015. On November 20, 2015, Wife filed a motion requesting the trial court's permission to sell the bed and breakfast property. By order of December 21, 2015, the trial court granted Wife's motion for the immediate sale of the bed and breakfast. The trial court ordered the net proceeds from the sale to be deposited with the court pending the hearing on the divorce.

By order of November 20, 2015, the trial court set a temporary parenting plan for the children. The temporary plan designated Wife as the primary residential parent and granted Husband alternate weekend residential time. On December 31, 2015, Husband filed a motion for *pendente lite* support. Wife opposed the motion, citing the parties' pre-nuptial agreement, under which each "waive[d] and relinquishe[d] any claim for alimony, spousal support or maintenance . . . ." On February 12, 2016, Husband filed a motion for partial summary judgment, wherein he attacked the validity of the pre-nuptial agreement and specifically argued that the agreement should be construed under New Mexico law because it was executed in that state. New Mexico law prohibits waiver of spousal support. Accordingly, Husband argued that applying New Mexico law to the pre-nuptial agreement should result in the unenforceability of the waiver of support clause. Wife opposed the motion for partial summary judgment. Following hearing, the trial court denied Husband's motion for partial summary judgment by order of May 24, 2016. The trial court held, in relevant part, that

> Husband has not sufficiently shown that he is entitled to judgment as a matter of law on the preliminary question of which state's law should apply to the prenuptial agreement. The parties clearly intended to waive any claim to alimony. The parties also clearly intended that their agreement be ambulatory. Tennessee, not New Mexico, has the most contacts with and interest in this matter. Accordingly, the Court denies Husband's motion for summary judgment.

On March 23, 2016, Wife filed a motion for leave to sell the marital home. By order of April 27, 2016, the trial court ordered the marital residence to be sold and placed Wife in charge of the sale. Specifically, Wife was authorized to "make whatever repairs and improvements that need to be made . . . ." At this time, there was a state tax lien in place on the marital residence, *see supra*. The lien was filed under "George

Giannakoulias d/b/a Brentwood Bed and Breakfast" as a result of Husband's failure to pay state taxes during his tenure as proprietor of the bed and breakfast. The parties disagreed as to the appraised value of the marital residence; however, the trial court ultimately approved sale of the property for $605,000. Following the closing, Wife deposited, with the trial court, $17,363.94 in net proceeds from the sale of the marital residence. After selling the marital residence, Wife and the children moved into Wife's mother's home, which is in Rutherford County. Wife testified that she pays monthly rent of $2,000 to her mother. The children are enrolled in school in Rutherford County.

As noted above, Husband left the marital residence in November 2015. Thereafter, he moved around quite a bit and sometimes stayed with friends. In its final order, the trial court found that, "[w]hen the children were still in Montessori school, Husband subleased an apartment 5 minutes from the Montessori school. Then, he subleased another apartment 5 minutes from the Montessori school. Then, he became homeless." After Wife moved to Rutherford County and enrolled the children in school there, Husband leased a home in Brentwood, where he remained at the time of the hearing. According to his testimony, Husband pays $2,000 per month in rent. Concerning his potential earning capacity, Husband testified that he can earn up to $3,200 per month. At the time of the hearing, he was employed at an hourly rate of $14.00; however, Husband testified that he does not work forty hours per week. Rather, his work schedule varies based on his parenting schedule.

The case was heard by the trial court on August 8, 9, and 15, 2016. By order of October 11, 2016, the trial court granted Wife a divorce on the ground of Husband's inappropriate marital conduct. As discussed in detail below, the court adopted Wife's proposed parenting plan, which named her as the children's primary residential parent, and divided the remaining marital property. Husband appeals.

**II. Issues**

Husband raises three issues for review as stated in his brief:

1. Whether the trial court abused its discretion in failing to adopt the Husband's parenting plan and award joint custody of the Children with each parent having equal time as residential custodial parent.

2. Whether the trial court erred in holding, as a matter of law, that the Husband was precluded from seeking alimony as a result of the Prenuptial Agreement signed by the parties in New Mexico just prior to their marriage.

3. Whether the trial court erred in excluding marital property subject to equitable division and in fashioning an inequitable division in regard to the

- 6 -

marital property it did consider.

## III. Standard of Review

Because this case was tried by the court, sitting without a jury, this Court conducts a de novo review of the trial court's decision with a presumption of correctness as to the trial court's findings of fact, unless the evidence preponderates against those findings. *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. R.R. Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999). This Court reviews the trial court's resolution of legal issues without a presumption of correctness. *Johnson v. Johnson*, 37 S.W.3d 892, 894 (Tenn. 2001).

## IV. Permanent Parenting Plan

Husband first contends that the trial court erred in declining to adopt his permanent parenting plan, which awarded the parties equal residential parenting time with the children. In *Maupin v. Maupin*, this Court explained the standard of review applicable to a trial court's determination of a child's parenting schedule, to-wit:

> The paramount concern in establishing a permanent parenting plan is the best interest of the children. See Tenn. Code Ann. § 36-6-401(a). The details of permanent parenting plans are typically left to the discretion of trial courts; thus, the ultimate question as to who should be the primary residential parent on appeal is whether the trial court abused its discretion in its selection. *K.B.J. v. T.J.*, 359 S.W.3d 608, 613, 616-17 (Tenn. Ct. App. 2011). The trial court's discretion is not unbounded. *Id*. In choosing the primary residential parent, the court engages in a "comparative fitness" analysis. *In re C.K.G.*, 173 S.W.3d 714, 732 (Tenn. 2005). The court is obligated to consider all of the relevant factors listed in Tenn. Code Ann. § 36-6-404(b). "It is our job in reviewing for an abuse of discretion to see that the trial court's order is made with due regard for controlling law and based on the facts proven in the case." *K.B.J.*, 359 S.W.3d at 616. Thus, if the evidence preponderates against the trial court's findings of fact upon which it bases it[s] determination, or simply focuses on facts which should not really matter while ignoring those that really do matter, the court may be found to have abused its discretion. *Id*. A slightly different way of phrasing the abuse of discretion standard is that "[a] trial court fails to exercise its discretion properly when its decision is not supported by the evidence, when it applies an incorrect legal standard, [or] when it reaches a decision which is against logic or reasoning that causes an injustice to the

party complaining." ***Owens v. Owens***, 241 S.W.3d 478, 496 (Tenn. Ct. App. 2007) (citing ***Biscan v. Brown***, 160 S.W.3d 462, 468 (Tenn. 2005)). Where the trial court makes specific findings of fact, we presume those findings to be correct unless the evidence preponderates against them. Tenn. R. App. P. 13(d); ***K.B.J.***, 359 S.W.3d at 613.

***Maupin v. Maupin***, 420 S.W.3d 761, 770 (Tenn. Ct. App. 2013), *perm. app. denied* (Tenn. Oct. 16, 2013).

We first note that, in its final decree of divorce, the trial court made a specific finding concerning the credibility of Husband's witnesses, to-wit:

> In addition to Husband and Wife, Martie Kelly, Dimitra Giannakoulias and Tony Giannakoulias all testified at trial . . . . The Court noticed that all three of Husband's witnesses were absurdly similar about the alcohol issue as well as Husband's role as care-taker for the parties' children. Also, their testimony about Husband's role was so dramatized as to be unrealistic and unbelievable. The Court inquired about where the witnesses stayed the night before the trial and whether or not the witnesses discussed the case and these issues being raised in the trial. The witnesses were together in the days and the night before the trial and they did discuss these issues. Based on these revelations as well as the witness' demeanor while testifying at trial, the Court finds none of Husband's witnesses to be credible regarding Husband's role as a care-taker of the children or the issue of Husband and his parents giving the children alcohol.

The weight, faith, and credit to be given witnesses' testimony lies in the first instance with the trial court. ***Roberts v. Roberts***, 827 S.W.2d 788, 795 (Tenn. Ct. App. 1991). With regard to credibility determinations, this Court has stated:

> When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to the trial court's factual findings. Further, "[o]n an issue which hinges on the credibility of witnesses, the trial court will not be reversed unless there is found in the record clear, concrete, and convincing evidence other than the oral testimony of witnesses which contradict the trial court's findings."

***In re M.L.P.***, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007) (citing ***Seals v. England/Corsair Upholstery Mfg. Co., Inc.***, 984 S.W.2d 912, 915 (Tenn. 1999)); ***In re Estate of Leath***, 294 S.W.3d 571, 574–75 (Tenn. Ct. App. 2008). Accordingly, where issues of credibility and weight of testimony are involved, this Court will accord considerable deference to the trial court's factual findings. ***In re M.L.P***., 228 S.W.3d

139, 143 (Tenn. Ct. App. 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co*., 984 S.W.2d 912, 915 (Tenn. 1999)).

In its October 11, 2016 order, the trial court adopted Wife's proposed parenting plan. This plan designates Wife as the children's primary residential parent, with 269 days of residential time. The plan provides Husband with 96 days of parenting time. In addition, Wife is granted major decision making authority with regard to the children's education, health care, religious upbringing, and extracurricular activities. Husband is ordered to pay $341.00 per month in child support based on a gross monthly income of $3,467.00. On appeal, Husband argues that the trial court erred in adopting Wife's parenting plan. Husband's primary argument is that he was the children's primary caregiver while Wife worked.

Tennessee Code Annotated section 36-6-106(a) provides, in pertinent part, that

> [i]n a suit for . . . divorce . . . or in any other proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest of the child. In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in this subsection (a), the location of the residences of the parents, the child's need for stability and all other relevant factors.

To this end, the statute provides a list of factors, which the trial court may rely on in fashioning a custody arrangement. Tenn. Code Ann. § 36-6-106. As set out in its order, the trial court made findings concerning several of the statutory factors. We will review each of the factors, on which the trial court relied, against the record to determine whether the trial court erred in adopting Mother's parenting plan.

The first statutory factor concerns "[t]he strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child." Tenn. Code Ann. § 36-1-106(a)(1). Regarding this factor, the trial court made the following relevant findings in its final order:

> In the first couple of years of the parties' marriage, Husband did care for the children a great deal. However, Wife and her mother, Ms. Larsen, also played a substantial role in caring for the young children. Indeed, Wife went to work in the morning and when Wife went home in the evenings after work, she cared for the children. Once the children were enrolled in Montessori school, the parties shared in the parenting responsibilities and Ms. Larsen assisted a great deal. Over the last year,

Wife has been the primary care-taker.

As set out above, the trial court made a specific finding that Husband's witnesses were not credible concerning Husband's role as the children's caretaker. Giving deference to this credibility determination, *In re M.L.P.*, 228 S.W.3d at 143 (citation omitted), we cannot conclude that the evidence preponderates against the trial court's finding that the parties have largely shared the parenting responsibilities for these children. Although the record shows that Husband was the "stay at home parent" during the time that the children were too young for school, the evidence also supports the trial court's finding that Wife was actively involved with the children's day-to-day schedules during this time. Wife testified that although she worked outside the home, she arranged her schedule so that she could come home to breast feed. In addition, Wife testified that her mother, Barbara Larsen, "was constantly helping with [the children]" and would stay at the parties' home "for weeks at a time." After the birth of the second child, Wife testified that "[t]here were babysitters [and nannies] who . . . [helped Husband] with the kids." The trial court ultimately concluded that "both parents have shared in the duties and responsibilities of being the primary caretaker of the children." From our review, we conclude that the evidence does not preponderate against the trial court's findings concerning the parties' respective roles as caregivers for their children. The record shows that both parents have been actively involved in the children's lives.

Factor two requires the trial court to consider:

Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order[.][1]

---

[1] Tennessee Code Annotated section 37-5-501(b)(1) defines "caregiver" as follows: "'Care giver,' 'care givers,' 'care provider,' or 'care providers' mean the person or persons or entity or entities responsible for providing for the supervision, protection and basic needs of the child."

Tenn. Code Ann. § 37-5-501(b)(1); Tenn. Code Ann. § 36-6-106(c) ("As used in this section, 'caregiver' has the meaning ascribed to that term in § 37-5-501").

Tenn. Code Ann. § 36-6-106(a)(2). Concerning this factor, the trial court found, in relevant part, that

> Wife's "potential for future performance of parenting responsibilities" is greater and weighs in favor of Wife being the Primary Residential Parent. In addition . . . Husband has not expressed a willingness and ability to facilitate and encourage a close and continuing parent-child relationship between the children and both of the parents. Husband signed a one-year lease far from where the children and Wife were living and from where the children were attending school just a few days before trial. Husband has refused to take the children to the extracurricular activities in which Wife wants them to participate. Husband failed to take the children to celebrate Wife's birthday. Husband is dismissive of Wife and her ideas in the presence of the children and is condescending to Wife in the presence of the children. On the other hand, when the children are with Wife, she allows the children to FaceTime Husband, Wife sends Husband pictures of the children and what they are doing, and Wife informs Husband of medical and counseling appointments.

The evidence supports the trial court's findings. Wife testified, in relevant part, as follows:

> When we were living together, [Husband] made demeaning comments about me very frequently. He would be very dismissive of things that I was trying to talk about. If I raised concerns, or if we had a difference of opinion, he would tell me that wasn't important. He would tell the kids that mom can't run the dishwasher. He, frequently, would make comparisons between our ethnic backgrounds. Mr. Giannakoulias is Greek, and so, he has darker skin that I do. He would tell the kids that mom was weak because she was Scandinavian.

Concerning Husband's willingness to make joint parenting decisions with Wife, she testified, in pertinent part, as follows:

> [A.] There is no joint decision making with Mr. Giannakoulias. He does what he wants to, and he does not agree to proceed with things the children need in a timely fashion.
>
> ***
>
> [Q.] In the past, when it's come to making joint decisions about the children, how do you—has there been a history of getting along and making joint decisions?

- 11 -

[A.] Educationally? No. As evidenced by, for example, [Husband] taking the children out of school, his describing to me that it is a waste of money to pay for our son who has a reading disorder to have reading tutoring or be tested . . . . As far as nonemergency healthcare, we are both the children's parents. We both deserve to know what is happening. I will always let [Husband] know what's going on. I will always confer with him . . . . But if he doesn't give them the care that they need, or he refuses to allow them to have care they need, or if he's unilaterally making decisions like giving them medications, that is not joint decision making. He does not consult with me, and he does not listen to me or respect any of my opinions.

Although Husband contested Wife's characterization of him as uncooperative and dismissive of her parenting suggestions, the evidence preponderates in favor of Wife's testimony concerning Husband's parenting style. From our review of the record, Husband made numerous unilateral decisions regarding the children's health, schooling, and safety. For example, the parties testified in great detail concerning an incident where Husband took the middle child to the dentist. The child's permanent teeth were coming in, but his baby teeth were not falling out. The parties had previously discussed the need for medical intervention. Wife testified that she assumed the child was being seen for an initial examination. However, on examination, the child's dentist suggested that the baby teeth be pulled and indicated that he could do the procedure at that time. The procedure, although relatively non-invasive, required that the child receive some sedation. During her testimony, Wife, who is a medical doctor, complained that Husband did not consult her prior to consenting to the procedure. During his testimony, Husband eschewed Wife's complaints regarding the child's dental procedure, stating that, "[Wife] was well aware of that appointment. . . . I believe I texted her something . . . texted or tried to call. . . . But this was a routine procedure to get teeth extracted."

Concerning the trial court's finding that Husband "failed to take the children to celebrate Wife's birthday," he conceded that he did not make the children available to Wife on her birthday, but explained that, "I know it wasn't under the parenting plan that we [] celebrate spouse's birthdays." Despite this statement, Husband admitted that he took the children out of school for the purpose of celebrating his own birthday.

Husband also admitted to giving the children melatonin as a sleep aid. Wife testified that she did not agree with giving the children any medication that wasn't specifically prescribed. During his testimony, Husband admitted that he did not ask Wife her opinion as to whether it was a good idea to give this medication to the children, explaining, "I did not feel it was necessary."

While it is clear that the parties have different parenting styles, the record shows that Wife is far more willing to consult with Husband concerning the children. As found

- 12 -

by the trial court, Wife ensures that the children FaceTime or phone their father at specified times. There is no evidence that Wife has made any significant parenting decisions without first consulting Husband. On the other hand, the record is replete with instances where Husband has excluded Wife from decisions regarding the children. Perhaps Husband's approach to co-parenting is best summed up in trial exhibit 6, a text exchange between the parties. At the time of the texts, the children were with Husband, who was between homes and staying with friends. Wife texted Husband to inquire about the friends' address and names and asked, "how do you know them? I am concerned about the kids being around people you don't know well." Husband replied, "I'm done answering any more questions. When they're with me its [sic] my judgement [sic] to keep them safe." From the totality of the circumstances, we conclude that the evidence supports the trial court's finding that this factor weighs in Wife's favor.

Concerning statutory factor four, "[t]he disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care," Tenn. Code Ann. § 36-6-106(a)(4), the trial court found that Husband has refused "to obtain gainful employment;" however, "[a]ny time Husband earned or realized any money, he did not place it into the family account. He sent it to his family in Florida. Wife always paid the bills and paid for what the children needed." The record supports this finding. As discussed above, throughout the marriage, Husband has not had stable employment. As such, Wife has been the primary provider for the family. At the time of the hearing, Husband was earning approximately $3,200 per month. By his own testimony, his monthly obligations are approximately $6,890. Husband's financial prospects are further complicated by liens levied by the IRS and his former attorney. Husband testified that, in order to keep his current housing, he will have to sell his Florida house and move his elderly aunt to Tennessee. From the record, even if Husband has the disposition to provide the children with necessaries, it is clear that he does not have the means to do so. Accordingly, this factor weighs in favor of Wife.

As to the seventh statutory factor, i.e., "[t]he emotional needs and developmental level of the child," Tenn. Code Ann.§ 36-6-106(a)(7), the trial court found that this factor weighs in favor of Wife. Specifically, the trial court found that

> Wife is the best parent to provide for the developmental needs of the children, especially [the oldest child] who has learning disabilities. Husband tends to downplay or disregard [the child's] needs in this regard. For example, [Husband] took [the child] out of school for three days to go to Sea World in Orlando, even though [the child] has learning disabilities and struggles in school. Also, Husband took the children out of school early to celebrate Husband's own birthday. Further, when Wife had [the oldest child] seen by an expert regarding his disabilities, Husband's only comment to Wife was "How much did that cost you?"

- 13 -

It is undisputed that the oldest child has a reading disability. Husband testified that he reads to the child and works with him on this issue. Wife, on the other hand, testified that she took the child to an "educational consultant," who recommended a reading program. Wife testified that she followed the recommendation. In addition, Wife procured tutoring and testing for the child. During the pendency of the divorce, Wife arranged for the children to see a counselor. As contained in exhibit 6, Wife texted Husband that the "counselor's next available slot to see kids is afternoon of the 12th. . . . That is during your parenting time. Are you agreeable with the kids going to see her then?" Husband replied, "No. The boys said it was a waste of time anyway." Wife's testimony, and the record as a whole, support a finding that she has been the primary steward of the children's educational and emotional needs. We conclude that the evidence supports the trial court's finding that this factor weighs in Wife's favor.

The trial court made extensive findings concerning factor eight, i.e., "[t]he moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child." Tenn. Code Ann. § 36-6-106(a)(8). Specifically, the trial court found that:

Husband has made many poor choices regarding the children. Just weeks before this trial in which Husband knew parenting would be a substantial issue, Husband took his three young children to the home of his nudist friends. Husband and his nudist friends were naked in the presence of the children—ages 8, 7, and 5—and the children were naked in the presence of their father and two strangers. They swam in the lake nude and a picture was taken of them nude. Either Husband was thumbing his nose at the judicial system or is completely disconnected with reality. Either way, this act alone is extremely concerning and causes the Court to question husband's parenting skills. This act alone is enough to designate Wife as Primary Residential Parent.

But, there are other reasons to designate Wife as the Primary Residential Parent. Husband gives these very young children alcohol, against Wife's wishes. Husband insisted the children be baptized by immersion into water and oil against Wife's wishes . . . . Husband took the children out of school to go celebrate Husband's birthday. He took [the oldest child,] who struggles in school, out of school for three days to go to Sea World. Husband failed to take [the middle child] for immediate medical treatment after he fell five to six feet off a ladder onto concrete. Husband told these very young children that there is no God. He also told them there is no Santa Claus, Easter Bunny, or Tooth Fairy. Just days before the trial, Husband signed a one-year lease on a residence in Brentwood, Tennessee, far from where Wife and the children have been living since May of 2016, and where Wife works. Husband does not have the money to pay this lease and the mortgage on the home he ow[ns] with his Aunt. . . . Husband claims he will earn $3,200 per month. The lease he

- 14 -

signed is $2,300 per month and the mortgage on the house in Florida is $2,000 per month. Husband's decision to sign a lease he cannot afford just days before trial is another example of Husband's financial irresponsibility. The Court believes Husband signed this lease in an attempt to convince the Court to make Husband the Primary Residential Parent. Husband's other financial irresponsibility is also evidence of poor parenting skills. As a parent of three children, Husband should be fiscally responsible. He is not. All of these reasons warrant a finding that Wife should be the Primary Residential Parent.

The evidence shows that when Wife is not present, Husband's parenting choices can be suspect. During his testimony, Husband admitted that the he and the children were naked at the home of his friends, who were also nude and are, in fact, practicing nudists. Husband allowed his friend to take a photograph of himself and the children while they were swimming nude. Husband explained that there was no sexual connotation because he and the children were submerged in the water so that only their heads were exposed. Wife was not present on this occasion.

While on a trip to Florida with Husband, where Wife was not present, the parties' middle child fell from the top rungs of a ladder onto a concrete floor. Husband testified that he was not overly concerned because the child did not show immediate signs of injury. Husband contacted Wife, who testified that she, as a medical doctor, told Husband to take the child for an examination. Despite Wife's opinion, Husband testified that he decided to wait. Although the child's arm showed bruising, Husband categorized it as minor. Husband further testified that the child did not complain that he was in pain, so Husband decided to take the children to the beach the next morning after the fall. On Wife's further insistence, Husband finally took the child for an x-ray, which showed the child had a fractured arm. Still, Husband maintained his position that he made the right choice concerning medical intervention, explaining that the break was only a "hairline fracture."

Concerning the fact that Husband allows the children to ingest small quantities of alcohol, he explained that, in his Greek family, it is common for children to be allowed small amounts of alcohol during family celebrations. Wife testified that she adamantly opposed Husband's stance on alcohol, explaining that, in her medical opinion, ingestion of alcohol by children is detrimental to their brain development. Despite Wife's concerns, the evidence indicates that Husband continued to allow the children alcohol. The record contains photographs of the children drinking contents from a bottle of alcohol, which states that it is 60 proof. Again, Husband minimizes his actions, testifying that consumption of alcohol is part of his heritage, and arguing that Wife was complicit in allowing the children to ingest alcohol.

As to Husband's financial situation, the trial court held that his bad decisions concerning finances are "also evidence of poor parenting skills." While a parent's financial problems do not, *ipso facto*, bear on his or her ability to parent, this is a special case. Here, Husband's financial shortcomings are indicative of his general disposition to thwart authority. As discussed in detail above, Husband mortgaged the Florida home, which is occupied by his ninety-five year old aunt (a co-owner), and proceeded to lose approximately $300,000 of the home's equity on day trading. Husband testified that, if he cannot maintain his current lease in Tennessee and also service the Florida mortgage, he will move his elderly aunt to Tennessee and sell the Florida home, where she lives and where she has invested substantial monies. Husband refuses to pay taxes on any income. This decision has led to a tax lien of almost four million dollars. Husband opines that the IRS lien is a non-issue because the IRS has deemed the debt uncollectible. Husband fails to comprehend the fact that the lien still exists and that any income or property he may acquire in the future could be encumbered by same. Despite the IRS lien, the record shows that in the years since the lien was levied, Husband still failed to file tax returns. In addition, Husband has not paid all of his attorney's fees in this case. He has hired and fired at least three attorneys and, in fact, made an oral motion to fire his attorney at the trial. Regardless, Husband's former attorney filed a $7,000 lien for fees. Despite his debts, Husband refuses to engage in long-term gainful employment.

In short, the evidence shows that Husband's attitude toward his finances is akin to his attitude toward co-parenting and life in general—he does not think the rules, norms, and expectations of society apply to him. As Wife stated in her testimony:

> [The children's] dad doesn't follow rules. He didn't follow what it stated in [the temporary custody order]. He does what he wants to do. He doesn't listen to me. When I raise concerns, he just shuts me down or ignores me or he does things with the kids, and then, I only learn about it afterwards. . . . He makes his own choices. He doesn't follow society's rules. He doesn't listen to me as their mother. He doesn't do checks and balances. . . . And giving him money, he won't necessarily spend money on what the kids need. His disposition is that he is himself and he does what he wants to not what the kids need.

The evidence supports Wife's statements. From our review of the entire record, we conclude that the evidence does not preponderate against the trial court's finding that this factor weighs heavily in Wife's favor.

As to factor eleven, i.e., "[e]vidence of physical or emotional abuse to . . . the other parent . . .," the trial court held that "the proof at trial showed that Husband was abusive to Wife even in the presence of the children." Turning to the record, Wife testified that, during the marriage and as tensions arose between the parties, Husband became abusive. For example, Wife testified that,

[w]hen we disagreed, it was usually on a difference of opinion. Something about money, something about the kids, and I tried really hard to keep the peace. But when there were issues I felt were important, and I would confront him about them, instead of discussing them with me and working through to an agreement . . . he would become verbally abusive and intimidating towards me and use foul language. . . .It didn't happen the first few years. But then, as we needed to come together as a husband and wife and make good life choices together, and as we needed to try to repair the financial damage that he had done when he gambled away all of his money, that was when they became more and more frequent. . . . He would give me really mean looks. He would come over close to me and look at me in an intimidating way, and he would curse at me and call me obscene names . . . . He would call me a [expletive] bitch. And he said I have a bad attitude, and it was because I was a [expletive] bitch that that's why he treated me this way and that's why he didn't do what I wanted him to do. And it was my fault because I used the wrong tone of voice, or I had a bad attitude, or I had bugged him. . . .

Wife described two other incidents where Husband's behavior became physical. In one instance, Wife was attempting to record one of Husband's verbal tirades on her cell phone. Wife stated that Husband "came over and yanked [the cell phone] away from me" and deleted the recording. In another incident, the family was visiting Husband's parents, and the middle child had a temper tantrum. Wife stated that Husband "always told me that I don't discipline the children. And he gets very angry if the children act bad in front of his family." When the child had the tantrum, Wife stated that Husband "took [the child] into a back bedroom. And I didn't know what he might do to [the child] because he was so angry." Wife followed Husband and attempted to enter the room behind him. At that point, Wife testified that Husband "grabbed me by the arms and pushed me back. I had bruises on my arms. And he called me names that day." Although Husband testified that he was never verbally or physically abusive to Wife, Wife's testimony provides a sufficient basis for the trial court's finding that this factor weighs in her favor.

Concerning factor twelve, i.e., "[t]he character and behavior of any other person who resides in or frequents the home of the parent and such person's interactions with the child," Tenn. Code Ann. § 36-6-106(a)(12), the trial court found that "Husband's family, with whom Husband is extremely close, provide alcohol to the children." The photographs where the children are consuming alcohol show the paternal grandparents pouring the drinks. Furthermore, Husband does not dispute (and, in fact, adamantly defends) his family's position on the children drinking alcohol. Accordingly, we cannot conclude that the evidence preponderates against the trial court's finding that this factor weighs in Wife's favor.

Finally, the trial court considered factor fourteen, i.e., "[e]ach parent's employment schedule. . . ," Tenn. Code Ann. § 36-6-106(a)(14). The trial court's order states, in relevant part, that:

> The Court has considered Wife's employment schedule and finds it to be conducive to her being the Primary Residential Parent. Husband did not have a regular schedule as of the trial date. Moreover, Husband chose to work less hours for numerous months in order to prepare for trial. Finally, Husband's employment schedule is extremely unpredictable given his employment history. Therefore, the Court finds that Wife's employment schedule weighs in favor of her being the Primary Residential Parent.

Although Wife is a surgeon and her work schedule has not always been predictable, her current position is more regular in terms of her hours. Despite her busy schedule, the record shows that, since having the children, she has arranged her schedule to be with them as much as she can. She should not be penalized for being the family's sole provider while juggling her parental duties; she has made admirable strides to accommodate both. Furthermore, Wife has ensured that she not only lives near the children's school but that she also works near the school. She testified that she is no more than ten minutes away from the children while they are in school. As noted by the trial court, Husband, on the other hand, has chosen to live relatively far from where the children are. His reason for selecting this rental home is that it is in a good neighborhood for the children; however, it does not appear that Husband chose his current location based on proximity to the children's activities or because of his employment. Considering the totality of the circumstances, we cannot conclude that the evidence preponderates against the trial court's finding that this factor weighs in favor of Wife.

Based on our review of the record, and for the reasons discussed above, we conclude that the relevant statutory factors, when viewed against the specific facts of this case, support the trial court's conclusion that Mother's parenting plan, including the designation of Mother as the children's primary residential parent, is in the children's best interest.

## V. Prenuptial Agreement

As discussed above, the trial court denied Husband's motion for partial summary judgment, finding that the parties' pre-nuptial agreement should be interpreted according to Tennessee law and that the parties intended to waive any claim to spousal support. In her brief, Wife asserts that Husband waived his issue concerning the prenuptial agreement because he "introduced no evidence at the final hearing that the Prenuptial Agreement was signed in New Mexico. Nor did the trial court receive evidence as it relates to New Mexico law and the requirements as it relates to a Prenuptial Agreement." In support of her contention that this issue is waived, Wife cites this Court's opinion in *Arrow Electronics v. Adecco Employment Services, Inc.*, 195 S.W.3d 646 (Tenn. Ct.

App. 2005), wherein we note that "when the trial court's denial of a motion for summary judgment **is predicated upon the existence of a genuine issue as to a material fact**, the overruling of that motion is not reviewable on appeal when subsequently there has been a judgment rendered after a trial on the merits." *Id.* at 650 (citations omitted) (emphasis added). Here, however, Husband's motion for partial summary judgment required the trial court to interpret the parties' contract. "Issues of contract interpretation present a question of law." *Atkins v. Atkins*, 105 S.W.3d 591, 593 (Tenn. Ct. App. 2002), *perm. app. denied* (Tenn. May 5, 2003). In the recent case of *Beard v. Branson*, the Tennessee Supreme Court stated:

> In this case, Trinity appeals the denial of summary judgment after a trial on the merits. "When the trial court's denial of a motion for summary judgment is predicated upon the existence of a genuine issue as to a material fact, the overruling of that motion is not reviewable on appeal when subsequently there has been a judgment rendered after a trial on the merits." *Hobson v. First State Bank*, 777 S.W.2d 24, 32 (Tenn. Ct. App. 1989); *see also In re Estate of Blackburn*, 253 S.W.3d 603, 611 (Tenn. Ct. App. 2007). **In this case, however, the denial of summary judgment was not based on the existence of a factual dispute, so it is appealable**.

*Beard v. Branson*, 528 S.W.3d 487, 494 n. 12 (Tenn. 2017) (emphasis added).

Turning to the substantive issue, as noted above, on February 26, 2016, Husband filed a motion for partial summary judgment attacking the validity of the waiver of spousal support provision of the parties' prenuptial agreement. We review a lower court's decision on a summary judgment motion de novo with no presumption of correctness. *Tatham v. Bridgestone Ams. Holding, Inc.*, 473 S.W.3d 734, 748 (Tenn. 2015) (citing *Parker v. Holiday Hospitality Franchising, Inc.*, 446 S.W.3d 341, 346 (Tenn. 2014)). Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. Our standard of review requires "a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015). Here, the denial of Husband's motion for partial summary judgment was based on the trial court's interpretation of the parties' prenuptial agreement. The interpretation of a contract is a matter of law that requires a de novo review on appeal. *See Hamblen County v. City of Morristown*, 656 S.W.2d 331, 335-336 (Tenn.1983). When resolving disputes concerning contract interpretation, our task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language. *Id.* at 333-34; *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975). All provisions in the

- 19 -

contract should be construed in harmony with each other, if possible, to promote consistency and to avoid repugnancy between the various provisions of a single contract. *Rainey v. Stansell*, 836 S.W.2d 117, 118-19 (Tenn. Ct. App. 1992), *perm. app. denied* (Tenn. 1992).

The parties' prenuptial agreement does not contain a choice of law provision. Rather, the document states only that "[i]t is intended that this Agreement be valid and enforceable within the provisions of (Statute#) of the State Law, and that the Case Law governs its interpretation." When deciding which state's law to apply to a particular dispute, courts undertake a choice of law analysis using the rules applicable in the forum state. *Williams v. Smith*, 465 S.W.3d 150, 153 (Tenn. Ct. App.2014); *Gov't Emps. Ins. Co. v. Bloodworth*, No. M2003-02986-COA-R10-CV, 2007 WL 1966022, at *26 (Tenn. Ct. App. June 29, 2007). As a general rule, the first step is to decide whether a conflict actually exists between the relevant laws of the different jurisdictions. *Shelby Cnty. Health Care Corp. v. Baumgartner*, No. W2008-01771-COA-R3-CV, 2011 WL 303249, at *13 (Tenn. Ct. App. Jan. 26, 2011); *Bloodworth*, 2007 WL 1966022, at *29; *see also Wayland v. Peters*, No. 03A01-9705-CV-00172, 1997 WL 776338, at *1 (Tenn. Ct. App. Dec. 17, 1997) (characterizing this as a "preliminary issue"). Here, the parties' prenuptial agreement provides that "neither [party] shall make any claim for or be entitled to receive any money or property from the other as alimony, spousal support, or maintenance . . . ." New Mexico Statute Annotated section 40-3A-4 provides that "[a] premarital agreement may not adversely affect the right of a child or spouse to support . . . ." Unlike New Mexico, Tennessee has not enacted a statute concerning a party's right to waive spousal support in a divorce. Accordingly, there is conflict between Tennessee and New Mexico law on this question.

Because the parties executed the agreement while living in New Mexico, Husband contends that the contract should be interpreted according to New Mexico law under the doctrine of *lex loci contractus*. Husband argues that application of New Mexico law would invalidate the waiver of spousal support clause contained in the parties' prenuptial agreement. The rule of *lex loci contractus* provides that a contract is presumed to be governed by the law of the jurisdiction in which it was executed absent a contrary intent. *Ohio Cas. Ins. Co. v. Travelers Indem. Co.*, 493 S.W.2d 465, 467 (Tenn. 1973). However, the Tennessee Supreme Court has held that "a contract is presumed to be made with reference to the law of the place where it was entered into unless it appears it was entered into in good faith with **reference** to the law of some other state." *Id*. (quoting *Deaton v. Vise*, 210 S.W.2d 665, 668 (Tenn. 1948)) (emphasis added). This exception to the *lex loci contractus* doctrine was discussed in *Messer Griesheim Industries, Inc. v. Cryotech of Kingsport, Inc.* as follows:

> Tennessee follows the rule of *lex loci contractus*. This rule provides that a contract is presumed to be governed by the law of the jurisdiction in which it was executed absent a contrary intent. *Ohio Cas. Ins. Co. v.*

*Travelers Indem. Co.*, 493 S.W.2d 465, 467 (Tenn.1973).

> If the parties manifest an intent to instead apply the laws of another jurisdiction, then that intent will be honored provided certain requirements are met. The choice of law provision must be executed in good faith. *Goodwin Bros. Leasing, Inc. v. H & B Inc.*, 597 S.W.2d 303, 306 (Tenn. 1980). The jurisdiction whose law is chosen must bear a material connection to the transaction. *Id*. The basis for the choice of another jurisdiction's law must be reasonable and not merely a sham or subterfuge. *Id*. Finally, the parties' choice of another jurisdiction's law must not be "contrary to 'a fundamental policy' of a state having [a] 'materially greater interest' and whose law would otherwise govern." *Id.*, n. 2 (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2) (1971)).

*Messer*, 131 S.W.3d 457, 474-75 (Tenn. Ct. App. 2003). Generally, cases that have applied the *Messer* factors have involved factual scenarios where the parties to the contract have expressly stated their choice of law. In other words, the parties have named the other state. *See, e.g., Blackwell v. Sky High Sports Nashville Operations, LLC*, 523 S.W.3d 624, (Tenn. Ct. App. 2017), *perm. app. denied* (Tenn. May 18, 2017); *Williams v. Smith*, 465 S.W.3d 150 (Tenn. Ct. App. 2014), *perm. app. denied* (Tenn. March 12, 2015). Indeed, in *Deaton v. Vise*, wherein the Tennessee Supreme Court first articulated the intent exception to the *lex loci contractus* doctrine, the Court specifically stated: "We think the better rule is that a contract is presumed to be made with reference to the law of the place where it was entered into unless it appears that it was entered into in good faith **with reference** to the law of some other state." *Deaton*, 210 S.W.2d at 668. In the instant case, the parties' prenuptial agreement does not "reference" the law of any state. *Id.*; *Ohio Cas. Ins.* Co, 493 S.W.2d at 467. In other words, a choice of law is completely lacking here.

In the absence of a specific choice of law provision, the trial court held that the parties "clearly intended this Agreement to be ambulatory in nature," and that "the Agreement would be interpreted by the law of the state where they're living at the time they need it." In the first instance, the trial court does not cite any case, nor has our research revealed any case, where a contract was found to be "ambulatory" in terms of choice of law. Nonetheless, in concluding that the parties intended the choice of law question to be left undetermined until the prenuptial agreement was triggered by the filing of the divorce (at which time the law of the jurisdiction having subject-matter jurisdiction over the divorce would apply), the trial court relied on other language employed in the contract. Specifically, at paragraph 6 (concerning the waiver of separate property and probate estates), the prenuptial agreement states that "each party waives [such rights] . . . whether arising by common law or present or future statute of **any jurisdiction** . . . " (emphasis added). The trial court found that "[t]his language, . . .

- 21 -

'future statute of any jurisdiction' is indicative of the parties' intention that this Agreement be ambulatory" because "this type of language contemplates that the parties may move to different states." The trial court further noted that "the Agreement only goes into effect in the event of a divorce. The divorce is now in Tennessee." In the first instance, the prenuptial agreement specifies that it "shall take effect only upon the solemnization of the marriage between the parties;" it does not state (as found by the trial court) that the filing of the divorce would trigger the agreement. Furthermore, "the rights and obligations of contracting parties are governed by the law in effect when they entered into their contract." *C–Wood Lumber Co. v. Wayne County Bank*, 233 S.W.3d 263, 282 (Tenn. Ct. App. 2007). Accordingly, a contract cannot be "ambulatory" in the sense that term is used by the trial court. Rather,

> [t]he *lex loci contractus* [the law of the place of the contract] becomes as much a part of the contract as if specifically incorporated therein, and, in the absence of evidence of contrary intention, the parties must be held to have contemplated the application of that law to the terms of their agreement.

*Moak v. Continental Cas. Co.*, 4 Tenn. App. 287, 292 (1927). Here, the parties' prenuptial agreement is silent as to choice of law. The use of "any jurisdiction" within the contract, *supra*, simply does not show a clear intent by the parties to apply Tennessee law to their prenuptial agreement. Accordingly, the doctrine of *lex loci contractus* dictates that New Mexico law applies to the prenuptial agreement. As discussed above, New Mexico law clearly prohibits parties from waiving their right to spousal support. Because the provision waiving spousal support is in conflict with New Mexico law, we conclude that the provision is not enforceable and vacate the trial court's order concerning the denial of alimony. This holding, however, does not negate the entire prenuptial agreement. By its own terms, the agreement is severable, to-wit:

> In the event any provision of this Agreement is deemed to be void, invalid, or unenforceable, that provision shall be severed from the remainder of this Agreement so as not to cause the invalidity or unenforceability of the remainder of this Agreement. All remaining provisions of this Agreement shall then continue in full force and effect. . . .

Furthermore, our holding does not, *ipso facto*, result in Husband receiving alimony, and we render no opinion concerning this question. Rather, in the absence of a specific waiver provision, the question of alimony must be decided by the trial court through application of the need/ability to pay paradigm. "Need is the single most important factor in the initial determination of whether alimony should be awarded, followed by the obligor's ability to pay." *Lancaster v. Lancaster*, 671 S.W.2d 501, 503 (Tenn. Ct. App. 1984). We, therefore, remand the case to the trial court for the sole purpose of determining whether Husband is entitled to alimony and, if so, the amount thereof.

## VI. Division of Marital Property

In his final issue, Husband argues that the trial court fashioned an inequitable division of property because it improperly classified marital property as separate property. Specifically, he alleges that the trial court erred in: (1) improperly applying "Paragraph 9" of the parties' pre-nuptial agreement to exclude Wife's retirement assets from the marital property; and (2) failing to consider certain funds earned or expended during the marriage as marital assets.

### A. Retirement Accounts

In its final order, the trial court found, in relevant part, as follows:

> Husband claims he is entitled to a portion of Wife's retirement accounts. Pursuant to Tennessee Code Annotated section 36-4-121(b)(1)(B), "'marital property' includes income from, and any increase in the value during the marriage of, property determined to be separate property in accordance with subdivision (b)(2) if each party substantially contributed to its preservation and appreciates." . . . In order to be "substantial," a spouse's contributions must be real and significant. *Brown v. Brown*, 913 S.W.2d 163 (Tenn. Ct. App. 1994). Moreover, "some link between the marital efforts of a spouse and the appreciation of the separate property must be established before the separate property's appreciation is considered marital property." *Telfer v. Telfer*, [No. M2012-00691-COA-R3-CV,] 2013 WL 3379370 (Tenn. Ct. App. 2013)[, *perm app. denied* (Tenn. Oct. 16, 2013)].
>
> In their Pre-Nuptial Agreement, the parties agreed that "[e]ach party specifically waives any right, whether created by statute or otherwise, to pension, profit-sharing, or other retirement benefits earned by or credited to the other . . . ." Therefore, Husband waived, via the Pre-Nuptial Agreement, any right to Wife's retirement accounts. In addition, as demonstrated by the above-cited statute, "retirement, and other fringe benefits accrued as a result of employment prior to the marriage, together with the appreciation of the value, shall be 'separate property.'" T.C.A. 36-4-121(b)(1)(B)(iii). Thus, all of Wife's retirement benefits accrued as a result of employment prior to the marriage are separate property and Husband is not entitled to them. Therefore, even if Husband had not signed the Pre-Nuptial Agreement, he would not be entitled to Wife's retirement accounts accrued as a result of her employment prior to the marriage.
>
> Moreover, the Court finds that Husband did not "substantially contribute to [the] preservation and appreciation of" any of the retirement accounts Wife accrued prior to the marriage. T.C.A. 36-4-121(b)(1)(B)(i)(ii). . . .

- 23 -

As noted above, by its plain language, the parties' prenuptial agreement is severable. Accordingly, although we determined that the provision concerning the waiver of spousal support is not enforceable under New Mexico law, there are no other conflicts between New Mexico and Tennessee law that would negate the other provisions of the parties' agreement.

Concerning retirement accounts, Paragraph 9 of the parties' prenuptial agreement provides, in relevant part:

> **ERISA RIGHTS**. Each party specifically waives any right, whether created by statute or otherwise, to pension, profit-sharing, or other retirement benefits earned by or credited to the other, including, but not limited to, any joint or survivorship rights and any right which might arise in the event of the parties' separation or the dissolution of the marriage.

Although Husband does not dispute that Paragraph 9 removes any of Wife's retirement benefits accrued prior to the marriage from the marital estate, he argues that any increase in these assets during the marriage should be classified as marital property. The resolution of this issue requires interpretation of Paragraph 9 of the parties' prenuptial agreement. This is an issue of law, which we review de novo with no presumption of correctness. *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000); *see also Gilley v. Gilley*, 778 S.W.2d 862, 863 (Tenn. Ct. App. 1989). When the terms of a contract are plain and unambiguous, they should be interpreted as written. *Petty v. Sloan*, 277 S.W.2d 355, 361 (Tenn. 1955). When the contract is ambiguous, however, we must gather the intention of the parties from the contract as a whole. *Greyhound Lines, Inc. v. Sharpe*, 565 F. Supp. 419, 421 (E.D. Tenn. 1983) (citing *Dearing v. Brush Creak Coal Co.*, 186 S.W.2d 329 (Tenn. 1945)). A contract is ambiguous only if "it is of uncertain meaning and may fairly be understood in more ways than one." *Empress Health and Beauty Spa, Inc. v. Turner*, 503 S.W.2d 188, 190-91 (Tenn. 1973).

The plain language of Paragraph 9 supports the trial court's finding that Husband waived any right to Wife's retirement accounts, whether accrued before or during the marriage. As set out above, Paragraph 9 states that the parties waive "any right . . . to . . . retirement benefits earned by or credited to the other . . . ." This is a broad waiver as there is no qualifying language from which to conclude that the parties intended to limit the waiver to those retirement benefits in existence at the time of the marriage. Rather, the parties agree to waive "any right" to the other's retirement benefits. "A contract is not ambiguous merely because the parties have different interpretations of the contract's various provisions, nor can this Court create an ambiguity where none exists in the contract. Courts cannot make contracts for parties but can only enforce the contract that the parties themselves have made." *Campora v. Ford*, 124 S.W.3d 624, 628 (Tenn. Ct. App. 2003). The term "any right," as used in Paragraph 9, is not ambiguous merely because it is broad. "The language used in a contract must be taken and understood in its

plain, ordinary, and popular sense. In construing contracts, the words expressing the parties' intentions should be given the usual, natural, and ordinary meaning." *Id*. Applying the "plain, ordinary, and popular" meaning to the term "any right" results in a finding that the parties intended to waive "any right" to the other's retirement account, regardless of when the asset accrued.

Furthermore, the trial court did not rely solely on the contractual language. The court also made extensive findings that Husband had not "substantially" contributed to the accrual of Wife's retirement accounts during the marriage. In relevant part, the trial court found that:

> Husband was a financial burden on the family from failing to pay income taxes and State sales taxes, to failing to be gainfully employed, to sending what little money he did earn to his extended family in Florida.

The evidence supports these findings. As discussed in great detail above, Husband did not work during the marriage and did not contribute financially.

Concerning Husband's argument that the trial court failed to give him credit for his role as a stay-at-home spouse, the trial court found that:

> Husband did not "substantially contribute" as a homemaker or care-taker as he would like the Court to believe. Wife and her mother did much of this work. Even if Husband had served in such role, he waived any claim to credit for this service in the Pre-Nuptial Agreement in which the parties specifically agreed that "each of the parties waives and relinquishes any . . . claims for services rendered, work performed, and labor expended by either of the parties during any period of cohabitation prior to the marriage and during the entire length of the marriage."

As discussed above, both Husband and Wife contributed to the care and maintenance of the marital home and the children. Wife's family took an active role in helping with the children. Accordingly, we cannot conclude that the evidence preponderates against the trial court's finding that Husband's contribution to the running of the household was "substantially" greater than Wife's. In addition, as noted by the trial court, the parties' pre-nuptial agreement unambiguously states that each party waives any claim for "services rendered, work performed, and labor expended" during the marriage.

### B. Classification and Division of Marital Property

In making a division of marital property, a trial court is charged to "equitably divide, distribute or assign the marital property between the parties . . . in proportions as

the court deems just." Tenn. Code Ann. § 36-4-121(a)(1). Trial courts have broad discretion in dividing marital estates, and their decisions are afforded great weight on appeal. ***Fisher v. Fisher***, 648 S.W.2d 244, 246 (Tenn. 1983); ***Harrington v. Harrington***, 798 S.W.2d 244, 245 (Tenn. Ct. App. 1990). A trial court's division of property need not be equal to be equitable. ***Batson v. Batson***, 769 S.W.2d 849, 859 (Tenn. Ct. App. 1988). As a general rule, courts will evaluate the fairness of a property division by its final results. ***Thompson v. Thompson***, 797 S.W.2d 599, 604 (Tenn. Ct. App. 1990). The trial court must decide each case on its own unique facts and circumstances. *See, e.g.,* ***Wade v. Wade***, 897 S.W.2d 702, 717 (Tenn. Ct. App. 1994). Although there is a presumption that marital property is owned equally, there is no presumption that marital property should be divided equally. ***Bookout v. Bookout***, 954 S.W.2d 730, 731 (Tenn. Ct. App. 1997). In making an equitable division of marital property, the trial court is to consider all relevant factors, including those listed at Tennessee Code Annotated section 36-4-121)(c); ***Jolly v. Jolly***, 130 S.W.3d 783, 786 (Tenn. 2004). These factors include, but are not limited to: (1) the duration of the marriage; (2) the age and employability of the parties; (3) the tangible and intangible contribution by one party to the education, training, or increased earning capacity of the other; (4) each party's ability for future acquisition of capital assets and income; (5) the contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property; (6) the value of the party's respective separate property; (7) the estate of each party at the time of marriage; (8) the economic circumstances of each party at the time of the division of marital property; and (9) the tax consequences to each party. Tenn. Code Ann. §§ 36-4-121(c)(1)-(9). The trial court may also consider "such other factors as are necessary to consider the equities between the parties." Tenn. Code Ann. § 36-4-121(c)(11).

Prior to the divorce, the parties agreed to the division of certain marital property. At the time of the hearing, the trial court found that the parties' marital assets were: (1) proceeds of $17,363 from the sale of the marital home; (2) proceeds of $34,036.35 from the sale of the bed and breakfast; (3) proceeds of $17,105.00 from the sale of bed and breakfast furnishings. The trial court divided these proceeds, totaling $68,505.29, as follows:

> The total proceeds held in the Williamson County Clerk & Master's Office are $68,505.29. This amount, divided by two, equals $34,252.65 per party. The net proceeds from the sale of the [marital residence] include a deduction in the amount of $4,742.95 for the State of Tennessee Tax Lien against Husband. The Court finds that amount should be assessed against Husband because it was his failure to pay the State sales taxes that resulted in the tax lien. The cost of repairs, cleaning, maintenance, and related storage fees for both the [bed and breakfast] and the [marital residence] properties amount to $38,525.10. Wife paid those expenses and should be reimbursed for them. Subtracting the amount of the State tax lien deducted

- 26 -

and the expenses in preparing the two properties for sale, as required by the Court, from Husband's one-half of the funds held in the Chancery Court gives Husband $10,247.00. Adding those same amounts to Wife's one-half of the funds being held in the Chancery Court to reimburse her for money she has paid out-of-pocket gives Wife $58,258.00. The Court finds this to be the most equitable way to divide this property.

On appeal, Husband argues that the trial court "failed to consider significant sums of money that were earned during the course of the marriage but diverted for non-marital purposes as part of the marital estate." In his brief, Husband specifies these "significant sums" as follows: (1) "Halford Place (Wife) $173,197;" (2) "Thorndale Drive (Wife) $68,000;" (3) "Florida Property (Husband) $72,000," (4) Leased Vehicle $10,800 ($300/month for 36 months);" (5) "Attorney Fees (Wife) $90,000;" (6) "Attorney Fees (Husband) $19,150;" (7) Bank Account Withdrawal (Wife) $86,750;" (8) "Sale of Marital Furniture (below market) $6,013;" (9) "Personal Moving Cost Expenses Wilshire Way $6,265;" (10) "Tax Lien on Bed & Breakfast $4,743 (assessed to Husband in property division . . . and paid in full at closing of property)."

Concerning the "Halford Place," "Thorndale Drive," and "Florida" properties, the parties' pre-nuptial agreement specifically lists the Thorndale and Halford properties as Wife's separate property and the Florida property as Husband's separate property. As to these assets, the trial court's order states:

[W]hat little money Husband did earn over this eight year marriage he sent to his extended family in Florida rather than supporting his wife and children. . . . Husband sent $72,000 to his extended family in Florida in lieu of caring for his immediate family, including his three children. Husband complains that Wife spent $20,000 to pay off a vehicle for her father and paid the mortgage on the Halford Place home. However, Wife had that mortgage at the time she signed the Pre-Nuptial Agreement and it is on the Agreement. Husband knew Wife would have to pay that debt.

The trial court's findings concerning the real property are supported by the evidence. As discussed above, the parties' pre-nuptial agreement unambiguously sets apart the Halford Place and Thorndale Drive properties as Wife's separate property. The pre-nuptial agreement further states that, prior to the marriage, the Thorndale Drive property was encumbered by a $300,000 mortgage, and the Halford Place property was encumbered by a $150,000 mortgage. During his testimony, Husband conceded that he knew about the mortgages on these properties and further understood that Wife would have to pay the mortgages with marital funds. Because the properties and their respective mortgages were contemplated as Wife's separate property in the pre-nuptial agreement, Husband is not entitled to any proceeds from the sale of same. On the other hand, at the time of the pre-nuptial, Husband disclosed that the mortgage on his Florida home "was paid off and

closed in 2004." Husband divulged that "[t]here are currently two home equity lines open on the property . . . with a combined total credit limit of $300,000." Husband testified that, prior to the marriage, there was nothing outstanding on these lines of credit. However, as discussed above, during the marriage, Husband borrowed, then lost, the full $300,000 in day trading. Accordingly, the trial court found that

> Husband engaged in Day Trading which caused him to lose $300,000. This $300,000 loss resulted in a mortgage on [Husband's] Aunt['s] home in Florida. Wife paid $2,000 per month on that mortgage for many years so that [the] 95 year old Aunt [] would not be removed from the house after foreclosure.

In short, Wife brought more debt to the marriage, i.e., approximately $450,000 in mortgage loans against her separate property. However, this debt was acknowledged by Husband in the pre-nuptial agreement, and the parties understood that marital funds would be used to pay these debts. When Wife sold the Halford Place property during the marriage, the net proceeds were comingled with the marital funds, and Husband even made a commission from the sale (which he used to service his Florida debt). Concerning Husband's separate assets, at the time of the pre-nuptial agreement, Husband had $300,000 in equity, which he soon converted to $300,000 in debt. It is undisputed that marital funds of at least $72,000 were used to pay this debt. In short, Husband benefitted not only from the comingling of Wife's separate funds (from the Halford Place sale) with marital funds but also from the use of marital funds to service the Florida debt he created.

Concerning Husband's complaint that Wife spent $90,000 in marital funds on her attorney's fees, the trial court's order provides:

> Husband also complains that Wife had, as of the time of trial, spent $90,000 in attorney's fees litigating this divorce. As [previously] mentioned . . . Wife and her attorney have had an extremely difficult time litigating this case because of Husband's failure to comply with Discovery requests and his use of four different attorneys. In addition, Husband's conduct in failing to pay the lease on the B & B caused additional litigation. Husband was a substantial cause in Wife's attorney's fees being so high. Thus, the Court does not share in Husband's belief that this amount should be a "distribution" of marital assets.

The trial court did not, in fact, order Husband to pay Wife's attorney's fees as alimony (although it could have done so based on its finding that Husband's non-compliance caused an increase in her fees). Rather, the trial court allowed marital funds to be used to pay each party's respective fees. Based on our review of the record, it is clear that Husband has engaged in a pattern of non-compliance and delay during the

entirety of this litigation. He should not benefit from his actions. Accordingly, we cannot conclude that the trial court's failure to credit Husband with some portion of Wife's attorney's fee payments is inequitable.

In considering the Tennessee Code Annotated section 36-2-121(c) factors, *supra*, the trial court held, in relevant part, that:

> The parties have been married eight years. Both parties are in good physical and mental health. . . Both parties have the ability to work and earn a decent wage . . . . Neither party has a financial need requiring distribution of a disproportionate share of marital assets. There has been no tangible or intangible contribution by one party to the education, training or earning power of the other party. Although at trial Husband alluded to helping Wife in her career, the Court does not find that he did so. Wife has the ability to earn more than Husband. Wife contributed substantially more to the acquisition, preservation, and appreciation of both the marital assets as well as to both parties' separate property. Husband, on the other hand, contributed substantially to the depreciation or dissipation of both the marital and separate property by losing $300,000 in Day Trading and by failing to work through most of the marriage. The value of Husband's separate property is substantially more than that of Wife. Husband owns separate property in Havertown, Pennsylvania, which appraised for $450,000 in 2005, but had a mortgage of approximately $235,000. Husband also has been awarded a judgment in the amount of $150,000. Wife owns a property on Thorndale Drive . . . with approximately $150,000 in equity as of August 12, 2008. The estate of each party at the time of the marriage was roughly equal. The economic circumstances of the parties at the time the division of property is to become effective is that Wife will be in a far better financial position than Husband because of Husband's own misconduct in losing the $300,000 and refusing to be gainfully employed.

For the reasons discussed in detail above, the preponderance of the evidence supports the trial court's findings. From the totality of the circumstances, we cannot conclude that the trial court's division of marital property was inequitable or that the trial court erred in denying Husband "credit" for the amounts set out in his brief.

## VII. Attorney Fees

Wife asks this Court to award damages for frivolous appeal under Tennessee Code Annotated section 27-1-122, which provides:

> When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon

motion of a party or of its own motion, award just damages against the appellant, which may include but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

The decision whether to award damages for a frivolous appeal rests solely in this Court's discretion. ***Chiozza v. Chiozza***, 315 S.W.3d 482, 493 (Tenn. Ct. App. 2009). "A frivolous appeal is one that is 'devoid of merit,' or one in which there is little prospect that it can ever succeed." ***Indus. Dev. Bd. v. Hancock***, 901 S.W.2d 382, 385 (Tenn. Ct. App. 1995). Although Husband has not prevailed on any of the issues he raised in this appeal, we do not conclude that his appeal is so devoid of merit as to be characterized as frivolous. Accordingly, we exercise our discretion to decline Wife's request for attorney fees and costs in defense of this appeal.

## VIII. Conclusion

For the foregoing reasons, we vacate the trial court's order enforcing the waiver of spousal support provision of the parties' prenuptial agreement. The case is remanded for determination of whether alimony is warranted in this case and, if so, the amount thereof. The trial court's order is otherwise affirmed. Costs of the appeal are assessed to the Appellant, George Giannakoulias, and his surety, for all of which execution may issue if necessary.

_____
KENNY ARMSTRONG, JUDGE